566 So.2d 1142 (1990)
Richard Dale GOODSON
v.
STATE of Mississippi.
No. 07-KA-58650.
Supreme Court of Mississippi.
July 11, 1990.
Rehearing Denied August 22, 1990.
*1143 Duncan Lott, Booneville, for appellant.
Edwin Lloyd Pittman, Atty. Gen., elected Supreme Court Justice Jan. 3, 1989, Mike C. Moore, Atty. Gen., and George W. Neville and Pat Flynn, Sp. Asst. Attys. Gen., Jackson, for appellee.
En banc.
ROBERTSON, Justice for the Court:

I.
Today's appeal charges once again that we vindicate the right of one accused of child sexual abuse to a fair trial according to accepted rules of evidence, while at once shielding the complainant from undue additional trauma, nor undermining the people's powerful interest in persistent prosecution of abusers. All of this we may seek only according to law. Because the trial court allowed the jury to hear an inadmissible expert opinion, we reverse and remand for a new trial.

II.
Richard Dale Goodson was born on August 15, 1939, and most recently has worked in Alabama. Goodson was the defendant below and is the appellant here.
Sonya T.[1] was born on January 24, 1972, and is Goodson's niece. Between the years when she was six and ten years old Sonya's family lived in Tishomingo County. During that time she says Goodson occasionally fondled her and raped her. Four years after the last incident, Sonya told her mother that she had been "abused and molested."
Sonya's parents have been married for seventeen years and have two girls, Sonya and a sister, three years younger. The family moved to Iuka in 1976 and left in 1982, then moving among several different northern states, coming back to live in Iuka from January until April, 1986. On February 8, 1986, Sonya told her mother of the alleged incidents with her uncle.
This criminal prosecution was formally commenced in April of 1986 when the Tishomingo County Grand Jury returned an indictment charging Goodson with forcible rape of a female under fourteen years of age. Miss. Code Ann. § 97-3-65(1) (Supp. 1989). The case was called for trial on April 17, 1987. Witnesses for the prosecution included the victim, her mother, and Dr. Linda Chidester who is engaged in the practice of medicine in Mantachie, Mississippi. Goodson took the witness stand in his own defense and denied all charges.
In due course, the jury found Goodson guilty of rape but was unable to fix the penalty. On the same day, April 17, 1987, the Circuit Court sentenced Goodson to serve a term of twenty years in the custody of the Mississippi Department of Corrections. This appeal has followed.

III.
Goodson first challenges the legal sufficiency of the evidence against him. He suggests the Circuit Court erred when it denied his motion for a directed verdict of acquittal and, thereafter, his motion for judgment of acquittal notwithstanding the verdict of the jury.
The Circuit Court properly denied these motions.

*1144 In passing on motions for directed verdicts and requests for peremptory instructions of not guilty, all evidence on behalf of the State is taken as true, together with reasonable inferences that may be drawn therefrom, and, if there is sufficient evidence to support a verdict of guilty, the motion for directed verdict must be overruled and peremptory instruction must be denied. Barker v. State, 463 So.2d 1080 (Miss. 1985); Shelton v. State, 445 So.2d 844 (Miss. 1984); Wilks v. State, 408 So.2d 68 (Miss. 1981); Bayse v. State, 420 So.2d 1050 (Miss. 1982).
Gill v. State, 485 So.2d 1047, 1049 (Miss. 1986); see also McKinney v. State, 521 So.2d 898, 899 (Miss. 1988); McFee v. State, 511 So.2d 130, 133-34 (Miss. 1987); Christian v. State, 456 So.2d 729, 734-35 (Miss. 1984); Otis v. State, 418 So.2d 65, 67 (Miss. 1982), Davis v. State, 406 So.2d 795, 801 (Miss. 1981). The same standard applies when we review a denial of an accused's post-verdict motion for judgment of acquittal. Faithful application of that standard yields affirmance on this issue.

IV.

A.
Goodson next argues that the Circuit Court erred when it overruled his objection to Dr. Linda Chidester's opinion testimony that Sonya had suffered sexual trauma. The opinion was given during the prosecuting attorney's direct examination of Dr. Chidester. Context is important.
Q. Was there anything unusual about Sonya's behavior or disposition that you noticed when you did the examination?
A. Yes, she was [objection raised by defense] ... She was extremely upset and frightened by the pelvic exam. She was crying. She did not want me to do the exam. When she first came, she said that she was not going to let me examine her. And then after talking to her and finally in the end just by being professional and saying, `Sonya, get undressed, put the sheet over you, put on the gown, I will be back in a moment'; and, walking out of the room and closing the door, then she did what I told her to do.
Q. Dr. Chidester, do you examine many girls and young women like Sonya in your practice?
A. I examine a good many young girls in my practice, yes.
Q. As compared to these others, would you call her behavior unusual?
A. Extremely unusual, yes.
Q. All right. Does this indicate anything to you as a doctor, or do you have an opinion based upon your experience as a doctor, and in the area of gynecology, and based upon reasonable medical certainty, is this indicative of anything to you.
[There was an objection by defense and the judge allowed Dr. Chidester to answer on the basis that she qualified as an expert.]
A. I think it indicates that she had been sexually traumatized in some way.
Up to and including Dr. Chidester's opinion testimony that Sonya's reaction was "extremely unusual," we perceive no error. Such opinion testimony is wholly admissible by virtue of Rules 702 and 703, Miss.R.Ev. The problem arises in Dr. Chidester's subsequent opinion, presented over Goodson's objection, that Sonya "had been sexually traumatized." The point is of importance, for Dr. Chidester's opinion, together with another item of evidence discussed below, goes far toward establishing the corpus delicti.

B.
Dr. Chidester is a practicing physician. She is not qualified as psychiatrist or psychologist. Dr. Chidester gave no evidence of any specialized training in the field of child sexual abuse.[2] Prior to expression of *1145 the opinion in issue, Dr. Chidester had stated only that "I examine a good many young girls in my practice." Less than prudent cross-examination elicited an "I have had a tremendous amount of experience in child sexual abuse," but no details are provided.
Our rules regarding admission of expert opinion testimony are found in Rules 702 and 703, Miss.R.Ev.[3] Like rules are in force in most jurisdictions, and in this context we begin by noting the counsel of a thoughtful and comprehensive interdisciplinary commentary.
Courts should proceed cautiously when considering the admissibility of expert testimony on child sexual abuse. It is vitally important that professionals offering such testimony be highly qualified. Courts should insist on a thorough showing of expertise before permitting individuals to testify as experts.
Myers, et al., supra, 68 Neb.L.Rev. at 145.
This counsel of caution is by no means limited to child sex abuse cases. "Generally, under our new Rules of Evidence, the decision of whether or not an expert witness is qualified to testify is within the trial court's [sound] discretion." May v. State, 524 So.2d 957, 963 (Miss. 1988) (citing Detroit Marine Engineering v. McRee, 510 So.2d 462, 467 (Miss. 1987); Hooten v. State, 492 So.2d 948 (Miss. 1986)). "The test is whether a witness `possesses peculiar knowledge or information regarding the relevant subject matter which is not likely to be possessed by a layman.'" May, 524 So.2d at 963 (citing McRee, 510 So.2d at 467; Henry v. State, 484 So.2d 1012, 1015 (Miss. 1986)). May makes clear that Rule 702 "does not relax the traditional standards for determining that the witness is indeed qualified to speak an opinion on a matter within his purported field of knowledge." May, 524 So.2d at 963.
Of significance, the prosecution in its brief on appeal makes no effort to defend Dr. Chidester's qualifications as an expert. To the contrary, the prosecution argues only that the contested opinion was admissible as a lay opinion, presumably under Rule 701, Miss.R.Ev. No doubt there are occasions when one who by profession possesses expertise may properly offer a lay opinion. Here Dr. Chidester was proceeding in her professional capacity. The record falls far short of establishing that Dr. Chidester had the professional competence to give the opinion at issue with the *1146 level of reliability our law demands of evidence offered at trial.[4]

C.
There is a second, more fundamental problem. Assuming arguendo that Dr. Chidester may be qualified as an expert in the field of child sexual abuse, there remains the serious question whether the particular opinion at issue  that Sonya "had been sexually traumatized"  was admissible.
Affirmative answers to two interrelated but separate questions must precede the factfinder's receipt of an expert's opinion: (1) "Is the field of expertise one in which it has been scientifically established that due investigation and study in conformity with techniques and practices generally accepted within the field will produce a valid opinion?"[5]Miss. Farm Bureau Ins. Co. v. Garrett, 487 So.2d 1320, 1326 (Miss. 1986); Handy v. Brantley, 471 So.2d 358, 366 (Miss. 1985); House v. State, 445 So.2d 815, 822 (Miss. 1984); see also, May, 524 So.2d at 963; and (2) will the proposed testimony assist the trier of fact? Rule 702, Miss.R.Ev.; Hosford v. State, 560 So.2d 163, 168 (Miss. 1990).
Though her language is loose, Dr. Chidester offered her opinion that Sonya was a sexually abused child. This is of concern, as it is doubtful that there is any such thing as a scientifically established child sexual abuse profile, a doubt we expressed only a few weeks ago in Hosford. The thoughtful literature on the subject seems virtually unanimous that such opinion testimony should not be admitted.[6] Myers, et al., supra, 68 Neb.L.Rev. at, 66-69; McCord, supra, 77 Journal of Criminal Law and Criminology at, 18-41; Cohen, supra, 74 Georgetown L.J. at 440-44. In this setting, Hosford admonishes:
Until such time as a profile has been scientifically established, courts should be reluctant to allow expert [opinion] testimony that a child displays the so-called typical characteristics of other [sexual] abuse victims.
Hosford, 560 So.2d at 168. We have never accepted the field, and the prosecution made no effort to establish it.[7]
Many states have banned expert opinion testimony that a child has been sexually abused. See, e.g., State v. Haseltine, 120 Wis.2d 92, 96, 352 N.W.2d 673, 676 (Ct.App. 1984); Johnson v. State, 292 Ark. 632, 639, 732 S.W.2d 817, 821 (1987); State v. Lash, 237 Kan. 384, 385, 699 P.2d 49, 50-51 (1985); State v. Black, 537 A.2d 1154, 1157 (Me. 1988); State v. Castore, 435 A.2d 321, 326 (R.I. 1981). Others allow it. Glendening v. State, 536 So.2d 212 (Fla. 1988); Townsend v. State, 103 Nev. 113, 734 P.2d 705 (1987). The most considered opinion on the point is that of Prof. Myers and his colleagues.
Because of disagreement among experts on child sexual abuse, and because of the consequences of criminal conviction, it may be appropriate in criminal jury trials to eschew behavioral science testimony *1147 cast in terms of a direct opinion that sexual abuse occurred.[8]
Nothing said here establishes any special rules for expert opinion testimony in child sexual abuse cases. Rules of law must proceed out of respect for the realities of the phenomena they seek to regulate, if justice is to be served. Our reading of Rule 702 only recognizes that the behavioral sciences do not generate opinions that are accepted with confidence as great as those emanating from experts in the natural or physical sciences. These differences inhere in the nature of the several sciences. The rule is the same. The phenomena regulated are what differ.
We reject the opinion at issue for want of an established and accepted scientific predicate and because nothing in the record shows Dr. Chidester qualified as an expert within the burgeoning and controversial field of child sexual abuse. Beyond these, attention to the specifics of Dr. Chidester's testimony is hardly reassuring. Dr. Chidester saw Sonya but once  for at most an hour and forty-five minutes. The record reflects but three predicates for her opinion: (1) the history Sonya gave, (2) the physical finding of absence of a hymenal ring (to be discussed below), and (3) Sonya's reaction to a pelvic examination.
The history, of course, was properly admitted. See Rule 803(4), Miss.R.Ev. The absence of a hymenal ring, and nothing more, is of little consequence  especially fours years after the fact. Sonya's reaction to the pelvic examination is problematic. In the first place, this is not among the factors researchers have found particularly probative of sexual abuse.[9] More significant, Dr. Chidester in no way explained how Sonya's reaction generated the opinion she offered. She testified that "I see a lot of young girls" and "I have had a tremendous amount of experience in child sexual abuse," yet she labeled Sonya's reaction "extremely unusual" and said "I have never had one to cry before (until Sonya)." What is glaringly absent is what, in Dr. Chidester's experience, suggested to her that Sonya's reaction was indicative of sexual abuse. If she has had a "tremendous amount of experience in child sexual abuse" but has "never had one cry before," common sense casts doubt on the credibility of Dr. Chidester's opinion that Sonya's crying was an idicia that she had been sexually abused. With this meager predicate, opinion testimony that Sonya "had been sexually traumatized in some way" is quite dubious.
Hosford is important. The prosecution had presented a similar opinion through an expert who, according to the record, was much more qualified than Dr. Chidester. The prosecution there fully developed a predicate for the expert's opinion. Notwithstanding, Hosford held "improper" the expert's testimony regarding the characteristics of child sexual abuse victims, noting the authorities cited here. 560 So.2d at 168. Hosford held the error harmless only because of the peculiar context that the defendant had predicated his entire trial strategy on the premise that the prosecutrix was indeed a victim of sexual abuse while a young child, only that the abuse had been committed by others. Richard Dale Goodson has not for a minute admitted that Sonya has been sexually abused. Hosford commands reversal here.

D.
In sum, the record falls far short of establishing that Dr. Chidester had the professional competence in the field of child sexual abuse to give the opinion at issue with the level of reliability Rule 702 and our law demand of evidence offered at trial. Moreover, the prosecution made no effort to show that behavioral science has developed to the point where even the most knowledgeable experts in the field may give opinions that sexual abuse has occurred with the required level of reliability. *1148 As such, there was a substantial probability that the jury would be misled by Dr. Chidester's opinion. The Circuit Court erred when it overruled Goodson's objection to the opinion at issue.
We hold further that this error "affected" Goodson's substantial right to a fair trial. Rule 103(a), Miss.R.Ev. In the factual context before us, we could not in candor suggest the error may have been harmless.

V.
Goodson argues further that the Circuit Court erred when it refused to allow him to present evidence of Sonya's sexual activity between the time she says he raped her in 1982 and the time she was first examined by Dr. Chidester in 1986.[10] The evidence at issue was that of defense witness, Chris Garner, who says that he was a friend of Sonya's at school. Sonya had previously testified that Goodson had raped her and that she had told Garner this. The Circuit Court quite correctly allowed Garner's denial that Sonya ever told him her uncle had raped her. At issue is Goodson's further proffer that Sonya told Garner she had had sex "with one of her boy friends ... while she lived up North." The testimony points to an alternative explanation of Dr. Chidester's finding that Sonya had lost her hymenal ring.
Testimony in such form is not in any event admissible as substantive evidence.[11] What Goodson offered was not within any exception to the hearsay rule enumerated in Rule 803, Miss.R.Ev. Because Sonya T. is not a party opponent within Rule 801(d)(2) and the statement attributed to Sonya T. does not fall within Rule 801(d)(1), what Goodson offered may not be received as an admission. It may, however, have been used as impeachment, provided Sonya T. was afforded the opportunity to explain or deny what Chris Garner says she told him. Rule 613(b), Miss.R.Ev. Because the problem will likely recur on remand, and because the matter is one of broad concern, we consider it with some care.
Ordinarily, the fact that a rape victim may not have been a virgin is wholly irrelevant. A prostitute has as much right not to be raped as any other person. Context is critical to Goodson's claim.
To begin with, the prosecution called Sonya T. who testified that Goodson had raped her. The prosecution then presented Dr. Chidester who testified that on August 22, 1986, she performed a "normal pelvic examination on Sonya." Upon this examination, Dr. Chidester found that the victim's hymenal ring was gone. Dr. Chidester went on to explain that some girls do not have a hymenal ring while others lose it through trauma other than sex. "[T]his tissue sometimes can be lost for various reasons, sexual intercourse being one of the more obvious ones." This was the only physical finding offered by the prosecution in support of the charge that Goodson had raped Sonya. Sonya's age gives the point its potency. The empirical data aside,[12] *1149 many believe a teenage girl may only lose her hymenal ring through sexual experience. The prosecution presented Dr. Chidester so that it could point the finger at Goodson. In this context, the defense sought to impeach Sonya's testimony that Goodson had raped her by offering Garner to testify that Sonya had told him that she had had sex with a boyfriend "up North." The unmistakable import of Sonya's testimony, coupled with that of Dr. Chidester, was that Goodson caused Sonya's loss of her hymenal ring by raping her. As the point was central to the prosecution's case, Sonya's testimony was subject to impeachment by the defense by showing that she had made a prior inconsistent statement, i.e., a statement suggesting that she was not worthy of belief on her explanation for Dr. Chidester's 1986 physical finding.
The question arises under Rule 412(b)(2)(A), Miss.R.Ev., the so-called rape shield rule, which limits what the accused may tell the jury of the victim's
past sexual behavior with persons other than the accused, offered by the accused ... [as evidence relevant to] the issue of whether the accused was or was not, with respect to the alleged victim, the source of semen, pregnancy, disease, or injury.
The purpose of the rule[13] is to prevent defense counsel from putting the victim *1150 "on trial," from unfairly invading the victim's privacy and from deflecting the jury's attention from the true issue. The rule reflects recognition that the trial process at best is traumatic to the victim of sexual abuse. If she has reason to believe the most intimate details of her life are going to be bandied about the courtroom, many victims will decide the game is not worth the candle and decline to file a complaint.
Our first question is whether for purposes of the rule "past sexual behavior" refers only to sexual behavior occurring prior to the date of the offense charged in the indictment, or whether it refers to sexual behavior at any time in the past, i.e., prior to trial. The answer is and always has been the latter.[14] The relevance of other sexual behavior of the victim which may explain the source of semen, pregnancy, disease or injury and thus exonerate the accused, as a matter of common sense, is not necessarily affected by whether it occurred before or after the event charged in the indictment. Conversely, the reasons why it would be unfair to delve into the victim's sexual experience prior to a rape extend equally to post-rape sexual activity.
This point settled, our question becomes whether the absence of a hymenal ring is a "disease or injury" within Rule 412(b)(2)(A). In today's context, we answer in the affirmative, for the reasons presently provided.
The Michigan Supreme Court addressed the general point in People v. Mikula,[15] 84 Mich. App. 108, 269 N.W.2d 195, 198 (1978). One of the issues in Mikula was whether the Michigan rape shield statute prohibited the admission of evidence of the complainant's sexual conduct with persons other than defendant if such evidence was offered for the sole reason of explaining the condition of the complainant's hymen and vaginal opening. Mikula, 269 N.W.2d at 197.
It is well settled that where the prosecution substantiates its case by demonstrating a physical condition of the complainant from which the jury might infer the occurrence of a sexual act, the defendant must be permitted to meet that evidence with proof of the complainant's prior sexual activity tending to show that another person might have been responsible for her condition.
Mikula, 269 N.W.2d at 198 (citations omitted).
The Mikula court then considered whether that state's legislature had changed this rule by not expressly authorizing introduction of such evidence in the rape shield statute. Id.
We conclude, therefore, that the Legislature intended that evidence of specific instances of sexual activity is admissible to show the origin of a physical condition when evidence of that condition is offered by the prosecution to prove one of the elements of the crime charged provided the inflammatory or prejudicial nature *1151 of the rebuttal evidence does not outweigh its probative value.
Id.
Here no question has been raised regarding the competency of Dr. Chidester's testimony regarding her physical findings. Still note should be taken of Mikula's consideration of similar testimony in light of the six month delay between the rape and the medical examination.
A physician's testimony regarding the condition of a complainant's genital area is competent circumstantial evidence of the fact of penetration .. . Whether such testimony should be excluded because of the lapse of time between the incident and the examination must be determined in light of the facts and circumstances of the case... .
However, a foundation must be laid for such testimony. There must be some evidence of the complainant's physical condition prior to the alleged assault. In the instant case, there was no evidence concerning the complainant's physical condition prior to the alleged incident. Unless such evidence is introduced, the medical testimony is irrelevant and immaterial.
Mikula, 269 N.W.2d at 199 (citations omitted). The relevance of this reasoning to retrial of the case at bar is readily apparent.
Other cases holding that source of injury relevant include: State v. Murphy, 134 Vt. 106, 353 A.2d 346 (1976) (improper exclusion of testimony that injury to child's genitals may have been caused by masturbation); State v. Baron, 58 N.C. App. 150, 292 S.E.2d 741 (1982) (improper exclusion of evidence that complainant tried to insert tampon prior to alleged rape and experienced much pain); see also United States v. Kasto, 584 F.2d 268, 271 n. 2 (8th Cir.1978).
There is an abundance of thoughtful commentary considering the point and supporting admissibility.
The prosecution often introduces evidence of the complainant's physical condition, typically evidence of pregnancy, injury (e.g., a torn hymen), venereal disease, or the presence of semen, and from this evidence the jury infers that the alleged sexual contact between the defendant and the complainant actually occurred. Following the introduction of evidence of the complainant's physical condition, evidence of the complainant's prior sexual conduct is relevant to the issue of whether the alleged sexual contact occurred if the sexual conduct evidence shows that the prosecution's evidence could have come from a source other than the defendant.
Comment, Rape Shield Statutes: Constitutional Despite Unconstitutional Exclusions of Evidence, 1985 Wis.L.Rev. 1219, 1233-34. Another commentator has reasoned:
Consider the following hypothetical case: The prosecution, in attempting to prove the rape's occurrence, offers evidence that semen was found in the victim's vagina shortly after the alleged assault. The accused wishes to make a showing that on the very same day and prior to the medical examination, the woman had intercourse with X. Or take two slightly different instances: The state tries to corroborate the crime by proof that the victim is pregnant or is suffering from a venereal illness. The defendant wants to show that Y had sexual relations with the complainant around the time when she must have conceived or that, prior to the onset of the disease, Z and others had been intimate with her. If the accused is not conceding that he committed the act (as, for example, by claiming consent) but rather is striving to point the finger at someone else, the law should not deny him crucial proof on these issues merely because it has the effect of revealing some of the victim's history. Placed in the scales of due process, the defendant's need to use this matter will, in the absence of special factors, clearly outweigh the state's general exclusionary interest. Not only does the evidence relate to the actor's identity much more closely than sexual behavior viewed as "character" bears on consent on a given occasion; it also covers a very limited range of conduct occurring over a brief *1152 period, not a lifetime's worth of experience. Moreover, in contrast to the use of these facts to evince consent or lack of veracity, here the evidence  albeit intimate or even embarrassing  does not exploit sexist stereotypes of women, and accordingly is less innately offensive. Therefore, since it serves an important probative function at minimal expense to the rape complainant, the judge should presumptively let it in.
Berger, Man's Trial, Women's Tribulation: Rape Cases in the Courtroom, 77 Colum.L.Rev. 1, 57-58, 98 (1977).
A rape complainant's testimony is usually corroborated by physical evidence  the presence of semen, resulting disease, or pregnancy. Often forcible rape cases also include testimony about the infliction and extent of physical injury to the victim. Proof that another man engaged in sexual intercourse with the complainant at or near the time of the alleged rape provides an alternative source of the physical evidence and is therefore obviously relevant. For this reason, many states permit the defendant to introduce evidence that someone other than himself was responsible.
Tanford & Bocchino, Rape Victim Shield Laws and the Sixth Amendment, 128 U.Pa.L.Rev. 544, 584 (1980) (citations omitted).
Professors Wright and Graham reason that an accused should be allowed to introduce past sexual behavior evidence whenever the prosecution produces evidence of "any physical consequences" to prove that the act took place. 23 C. Wright & K. Graham, Federal Practice & Procedure § 5388, at 598 (1980); see Galvin, Shielding Rape Victims in the State and Federal Courts: A Proposal for the Second Decade, 70 Minn.L.Rev. 763, 818-25 (1986) (exception should be directed to all possible physical consequences of rape alleged by prosecution); cf. Note, Indiana's Rape Shield Law: Conflict with the Confrontation Clause? 9 Ind.L.Rev. 418, 425 (1976) (there is also obvious probative value to evidence which discloses previous intercourse with someone other than the defendant when such evidence can account for a physical fact in evidence at the trial * * *). See also Rothstein, New Federal Evidence Rule 412 on Sex Victim's Character, 15 Crim.L.Bull. 353, 359-61 (1979); Spector & Foster, Rule 412 and the Doe Case: The Fourth Circuit Turns Back the Clock, 35 Okla.L.Rev. 87, 102, 105-07 (1982); Note, United States v. Shaw: What Constitutes an "Injury" Under the Federal Rape-Shield Statute, 43 Univ.Miami L.Rev. 947 (1989).
We are not unaware of United States v. Shaw, 824 F.2d 601 (8th Cir.1987), holding that the condition of a rape victim's hymen is not an "injury" within Rule 412(b)(2)(A), Fed.R.Ev. We consider that the authorities cited and quoted from above, both in their holdings and their reasoning, show Shaw as simply wrong. We hold that, where the prosecution proves the condition of the victim's vaginal opening to induce belief that the condition is the result of an injury-producing and otherwise illegal act of sexual violence committed by the defendant, that injury-produced condition is an injury within our Rule 412(b)(2)(A). We considered an analogous point in Murriel v. State, 515 So.2d 952, 954-56 (Miss. 1987). The prosecution had presented testimony that the ten-year-old victim had had an abortion. Evidence that the abortion had followed pregnancy caused by defendant was tenuous at best. Going further than is required today, the Court held the potency of the prosecution's point so prejudicial that a mistrial should have been ordered, notwithstanding that defendant was allowed to show he was not responsible for the pregnancy and resulting abortion. See also Stokes v. State, 484 So.2d 1022, 1025 (Miss. 1986). The Murriel principle is at least broad enough to hold here that Goodson of right could offer competent evidence that his actions may not have caused Sonya's loss of her hymenal ring.
On remand this matter is committed to the Circuit Court's discretionary authority within Rule 412(c)(3), Miss.R.Ev., but to be exercised in a manner not inconsistent *1153 with this opinion.[16]

VI.
Goodson also argues that the Circuit Court erred in allowing Dr. Chidester to say that Sonya told her that her uncle had sexually abused her and, more important, that she, Dr. Chidester, was of the opinion that Sonya was telling the truth. The point may not ground reversal, for the record reflects Goodson "opened the door." Because the issue appears likely to recur on remand, we address it.
Put generally, the question is whether under Rule 702 the trial court may admit expert opinion testimony that a child alleged to have been the victim of sexual abuse is telling the truth. In Williams v. State, 539 So.2d 1049, 1051 (Miss. 1989), we said such testimony would be "of dubious competency." We repeated the doubt in Hosford, 560 So.2d at 166-67. Hall v. State, 539 So.2d 1338, 1341 n. 1 (Miss. 1989), recognizes this as a "hotly disputed legal issue," but did not address the question. Before Rule 702 became law, the Court had held that a psychologist who hypnotized an eight-year-old girl could not testify that in his opinion the girl was telling the truth when under hypnosis she said the defendant had sexually abused her. House v. State, 445 So.2d 815, 821-23 (Miss. 1984).
The law forbids use as evidence the results of a lie detector test. Garrett v. State, 549 So.2d 1325, 1330 (Miss. 1989); Miskelley v. State, 480 So.2d 1104, 1108 (Miss. 1985); Pennington v. State, 437 So.2d 37, 40 (Miss. 1983); Jordan v. State, 365 So.2d 1198, 1204 (Miss. 1978). On what basis can the court find that a physician's opinion of the truthfulness of a child is more reliable than a lie detector's "opinion" of the truthfulness of the person tested? One authority reports "that behavioral scientists themselves recognize that they have no particular expertise in evaluating the credibility of a child abuse complainant." McCord, supra, 77 Journal of Criminal Law and Criminology at 44. Prof. Myers and his colleagues have carefully considered the point and conclude that "[i]t is appropriate to prohibit expert testimony that a child told the truth on a particular occasion." Myers, et al., supra, 68 Neb.L. Rev. at 127; see also Myers, supra, 28 J.Fam.L. at 19-20. And the overwhelming majority of courts preclude such testimony. See, e.g., State v. Moran, 151 Ariz. 378, 385, 728 P.2d 248, 255 (1986), where the court wrote:
Experts called to testify about behavioral characteristics that may affect an alleged victim's credibility may not give an opinion of the credibility of a particular witness. Psychologists and psychiatrists are not, and do not claim to be, experts at discerning truth. Psychiatrists are trained to accept facts provided by their patients, not to act as judges of patients' credibility.
See also Thompson v. State, 769 P.2d 997 (Alaska Ct. App. 1989); State v. Lindsey, 149 Ariz. 472, 474-75, 720 P.2d 73, 75-76 (1986); People v. Oliver, 745 P.2d 222, 225 (Colo. 1987); People v. Ross, 745 P.2d 277, 278 (Colo.Ct.App. 1987); Tingle v. State, 536 So.2d 202 (Fla. 1988); Head v. State, 519 N.E.2d 151, 153 (Ind. 1988); Lawrence v. State, 464 N.E.2d 923, 925 (Ind. 1984); State v. Brotherton, 384 N.W.2d 375, 378-79 (Iowa 1986) (court held that testimony that a young child could not fantasize about a sexual act was improper indirect testimony regarding the child's credibility); *1154 State v. Jackson, 239 Kan. 463, 470, 721 P.2d 232, 238 (1986); People v. Reinhardt, 167 Mich. App. 584, 596, 423 N.W.2d 275, 282 (1988); State v. Miller, 377 N.W.2d 506, 508 (Minn. Ct. App. 1985); State v. Bailey, 89 N.C. App. 212, 219, 365 S.E.2d 651, 655 (1988); State v. Holloway, 82 N.C. App. 586, 587, 347 S.E.2d 72, 73 (1986); State v. Middleton, 294 Or. 427, 437 n. 11, 657 P.2d 1215, 1221 n. 11 (1983); Commonwealth v. McNeely, 368 Pa.Super. 517, 520, 534 A.2d 778, 779 (1987) (an expert's "opinion on the accuracy of the victim's recitation of facts is inadmissible"); State v. Ramsey, 782 P.2d 480, 485 (Utah 1989); State v. Rimmasch, 775 P.2d 388, 406-407 (Utah 1989); State v. Eldredge, 773 P.2d 29 (Utah 1989); State v. Madison, 53 Wash. App. 754, 770 P.2d 662 (1989); Zabel v. State, 765 P.2d 357 (Wyo. 1988); Griego v. State, 761 P.2d 973 (Wyo. 1988).

VII.
The judgment of the Circuit Court that Richard Dale Goodson stand convicted of the crime of rape and the sentence of imprisonment imposed thereon are reversed and this case is remanded to the Circuit Court for a new trial on all issues. See West v. State, 553 So.2d 8, 12 (Miss. 1989); Hall v. State, 539 So.2d 1338, 1348 n. 24 (Miss. 1989); Johnson v. State, 529 So.2d 577, 579 (Miss. 1988).
REVERSED AND REMANDED.
PRATHER and BLASS, JJ., concur.
DAN M. LEE, P.J., and SULLIVAN, J., concur and file special concurring opinions.
HAWKINS, P.J., dissents and files an opinion joined by ANDERSON, J.
ROY NOBLE LEE, C.J., dissents with separate opinion joined by HAWKINS, P.J., and ANDERSON, J.
PITTMAN, J., not participating.
DAN M. LEE, Presiding Justice, concurring:
I concur with the decision reached in this case and join the opinion of the majority, except insofar as it treats as authoritative provisions of the Mississippi Rules of Evidence. On this point, I am compelled to point out that the Mississippi Rules of Evidence have not been officially approved as required by § 9-3-71 which reads, in part:
(1) Such rules as are adopted by the supreme court shall be filed with the secretary of the senate and the clerk of the house of representatives and the secretary and the clerk shall immediately forward copies of the rule or rules to the members of the judiciary en banc committee for judiciary committee of each respective house. The clerk of the supreme court shall, at the time such rules are filed with the secretary of the senate and the clerk of the house of representatives, mail simultaneously to members of the legislature and the Mississippi State Bar copies of the rule promulgated by the court. Such rules shall be come effective on the first day of May next succeeding the sine die adjournment of the legislature which occurs at least thirty (30) days after the date upon which such rules shall have been filed ...; provided, that if the legislature by concurrent resolution reported by the judiciary en banc committee or judiciary committee of each house of the legislature and passed before such sine die adjournment shall disapprove any of such rules, the particular rule or rules disapproved shall be suspended and of no effect. Any rules heretofore or hereafter adopted by the supreme court which are filed with the secretary of the senate and the clerk of the house of representatives during the 1982 regular session of the Mississippi Legislature shall not be mailed to the members of the legislature and the Mississippi State Bar.
* * * * * *
(3) Any rule hereafter proposed or promulgated by the supreme court which has not been submitted to the legislature and become effective in accordance with the provisions of subsection (1) of this section shall be of no force and effect.

*1155 I am of the view that our pre-Rules law of evidence compels reversal on the grounds stated by the majority.
SULLIVAN, Justice, concurring:
Based on our decision in Hosford v. State, 560 So.2d 163 (1990 Miss.), I believe that the conviction in this case must be reversed and I join the majority in that result.
ROY NOBLE LEE, Chief Justice, dissenting:
I have examined the record and briefs, and have studied the majority opinion and the dissents. I have come to the conclusion that Dr. Linda Chidester sufficiently qualified as an expert in her medical field to testify and give an opinion on the matters involved from her examination.
In my view, the lower court did not abuse its discretion by permitting Dr. Chidester to testify as to her conclusions. Her credibility and the weight to be given her testimony was for the jury to determine.
I would affirm the judgment of the lower court and, therefore, I dissent.
HAWKINS, P.J., and ANDERSON, J., concur.
HAWKINS, Presiding Justice, dissenting:
I respectfully dissent.
The majority reverses for the admission of Dr. Chidester's statement explaining that Sonya's unusual behavior when examined "indicates that she had been sexually traumatized in some way."
Dr. Linda Chidester at the time of trial on April 14, 1987, had been a licensed, practicing physician for thirteen years, holding a medical degree from the University of Tennessee, and whose professional qualifications as such were stipulated.
Her practice entailed the examination of a "good many young girls." She also testified, "I have had a tremendous amount of experience in child sexual abuse."
On August 22, 1986, she saw and examined Sonya, 14, spending an hour and forty-five minutes with her. During this time she also counseled Sonya. Any person who goes to a physician as a patient knows this is a very long time for a doctor to spend with a patient.
Without objection from the defense, she testified that Sonya had been having nightmares, and told her that she had been "raped by my uncle," and gave her a history of what happened.
She testified that Sonya's behavior was unusual when she was about to be physically examined.
She was extremely upset and frightened by the pelvic exam. She was crying. She did not want me to do the exam. When she first came, she said that she was not going to let me examine her. And then after talking to her and finally in the end just by being professional and saying, "Sonya, get undressed, put the sheet over you, put on the gown, I will be back in a moment," and walking out of the room and closing the door, then she did what I hold her to do.
Asked whether the child's behavior was unusual, Dr. Chidester replied, "Extremely unusual, yes."
Dr. Chidester was then asked whether "based upon your experience as a doctor, and in the area of gynecology, and upon reasonable medical certainty," did such behavior indicate anything to her.
She replied, "I think it indicates that she had been sexually traumatized in some way."
On cross-examination, when asked for further explanation, Dr. Chidester testified that she had made pelvic examinations of many young girls, and while none of them appeared to want, or to enjoy such an examination, normally they were not scared to the point Sonya was. And, she had never had a child patient cry before such an examination.
This was a perfectly proper opinion for Dr. Chidester as a physician to give. She expressed no opinion as to Sonya's truthfulness, she did not attempt to particularize criminally or sexually any event or pattern. *1156 She pointed no finger of accusation towards Goodson.
The record reveals that Dr. Chidester, as is true of the overwhelming majority of medical doctors in their testimony, was not given to hyperbole. All she testified was that the unusual behavior she observed of Sonya to her indicated that at some previous time she had had an unpleasant experience involving her sexual organs.
The majority tells us first that Dr. Chidester offered her opinion that Sonya was a "sexually abused child." (Emphasis added) (Majority Opinion, pp. 1146, 1147, 1148) I disagree. Dr. Chidester did not express this opinion.[1]
Having constructed a house Dr. Chidester did not build, the majority concludes by knocking it down: "The record falls far short of establishing that Dr. Chidester had the ability to give the opinion at issue with the level of reliability Rule 702 and our laws demand of evidence offered at trial." (Majority Opinion, p. 1147) The majority denigrates the medical profession.
Far from Dr. Chidester, a medical doctor, not having the professional competence to form a valid, reliable opinion that somewhere in this child's background she had undergone some unpleasant sexual experience, I should think it took no particular expertise to form that particular opinion. A nurse could easily have done so. It could have been an injury, it could have been any one of a number of different kinds of sexually painful experiences. Dr. Chidester made no attempt to particularize.
And why was that a perfectly valid opinion? If a child is terrified and screaming upon being brought near an open fire, what does this indicate?
This 14-year-old child refused to change into a gown for a female doctor to examine her, and in fact burst into tears when told the doctor wanted to examine her. What does this indicate? Some painful memory involving a private part of her body. Yet the majority tells us scientific evidence has not advanced far enough to permit a medical doctor who regularly treats young girls to express an opinion from such behavior that it indicated a traumatic sexual experience.[2]
Courts have always recognized the competency of a treating physician to express an opinion as to the physical and mental condition of his patient. Miss. Code Ann. § 93-13-255; Harvey v. Meador, 459 So.2d 288 (Miss. 1984); In re Richard, 655 S.W.2d 110 (Mo. 1983); 31A Am.Jur.2d, Expert and Opinion Evidence, § 179 p. 183; 32 C.J.S. Evidence, § 101 c., p. 391; also, comment to Rule 703 Federal Rules of Evidence. Dr. Chidester's opinion was well within range of permissible opinions by physicians.

THE STRAW HOUSE
The majority disingenuously transforms Dr. Chidester's opinion into one it believes it can attack. Having told us that Dr. Chidester had expressed the opinion that Sonya was a "sexually abused child," the majority goes on to state that "it is doubtful that there is any such thing as a scientifically established child sexual abuse syndrome or profile." "The thoughtful literature on the subject seems virtually unanimous that syndrome testimony should not be admitted." [Emphasis added] (Majority Opinion, p. 1146).
Where did Dr. Chidester testify that there was a child abuse "syndrome" or *1157 "profile"? Human nature and human experience being as broad and varied as it is, and the manner and ways of inflicting sexual abuse upon children coming in such widely different forms, as a non-professional I can envision the difficulty in formulating some precise formula for asserting that when you have certain specific symptoms of behavior, you will have a case of a child who has been sexually abused. Or when you do not have them, you do not have a case of child sexual abuse. If human behavior were that simple and pat there would be no need for experts or specialists in the field.
It is precisely because of the subtle and complex problems of child sexual abuse that courts need experts to interpret such behavior.
The majority is asserting an expert role for itself, however, and one which it most assuredly lacks in failing to recognize and acknowledge that there are experts in the field of child sexual abuse who can recognize certain types of behavior as consistent with a child who has been sexually abused in some manner. And, I am absolutely astounded for this Court to suggest that with the thousands upon thousands of cases of child sex abuse in this nation, and the host of professional people such as physicians who routinely examine and interview these pathetic children, that there are no reliable symptoms upon which a professionally trained person can form a valid opinion.
While Dr. Chidester did not go that far, from this record she was qualified by her training and experience to have testified whether Sonya's behavior was or was not consistent with symptoms of behavior she had noticed in children patients of hers who had been victims of child sexual abuse. Her professional qualification was never challenged. It is well settled that such testimony by a professionally qualified person is competent evidence. Rodriquez v. State, 741 P.2d 1200, 1204 (Alaska 1987); U.S. v. Azure, 801 F.2d 336, 340 (8th Cir.1986); State v. Middleton, 294 Or. 427, 657 P.2d 1215 (1983); State v. Kim, 64 Haw. 598, 645 P.2d 1330 (1982); Commonwealth v. Dockham, 405 Mass. 618, 542 N.E.2d 591, 597 (1989). Myers, et al, "Expert Testimony in Child Sexual Abuse Litigation," 8 Neb. Law Review (1989). The State did not attempt to secure such an opinion, however, and Dr. Chidester made no attempt to give it.
And, such an opinion would no doubt have been helpful to the jury in this case in understanding Sonya's failure to report Goodson's criminal behavior for four years. Rule 702, Miss.R.Evid. (MRE).[3] It is quite common, and perhaps more frequent than not, that child victims of sexual abuse will not report it for months, or years later, many even carrying the secret with them into adulthood. See: Rodriquez v. State, supra; People v. Dunnahoo, 152 Cal. App.3d 561, 577, 199 Cal. Rptr. 796, 804 (1984); Smith v. State, 100 Nev. 570, 572, 688 P.2d 326, 327 (1984); People v. Benjamin R., 103 A.D.2d 663, 669, 481 N.Y.S.2d 827, 832 (1984); State v. Petrich, 101 Wash.2d 566, 576, 683 P.2d 173, 180 (1984); State v. Claffin, 38 Wash. App. 847, 852, 690 P.2d 1186, 1190 (1984).
But the State did not attempt to secure such an opinion from Dr. Chidester.

COMPARE
I find the majority's niggling and totally negative approach to admission of expert testimony in child sexual abuse cases quite at odds with the treatment this Court has of recent years given to proffered expert testimony in other areas.
In Kniep v. State, 525 So.2d 385 (Miss. 1985), the issue was whether the deceased died (1) as a result of excessive bleeding from knife wounds inflicted by his wife, or (2) whether he had died as a result of drinking isopropyl ("rubbing" alcohol), which he either drank (a) accidentally, or (b) intentionally to commit suicide. It *1158 would have been perfectly proper, of course, for the pathologist witness to express an opinion that the cause of death was isopropyl poison rather than blood loss. This Court, however, held that it was error for the trial court not to also permit the pathologist to express the expert opinion that the deceased "accidentally" drank the stuff. To do so, of course, he would have to go inside a dead man's head and resurrect his thinking process.
In Miller by Miller v. Stiglet, Inc., 523 So.2d 55 (Miss. 1988), this Court held that a highway patrolman, a high school graduate, was competent to express the expert opinion that an accident he did not see had been caused by a car "exceeding the speed limit of 30 miles per hour," hitting a "bump in the road," "which caused her car to come up in the air," and when "she came back down," because of "her tires being slick" her vehicle "skidded over to the left lane," and the driver "lost control of her car," before approaching a spot of sand, etc. This officer had made no skid mark or any other measurements at the scene.
In that decision this Court also held it perfectly proper for the highway patrolman who investigated the accident (also a high school graduate), to give the following expert opinion as to the cause of the accident: "First, wet road. Two, slick tires. Three, speed."
In Henry v. State, 484 So.2d 1012 (Miss. 1986), and again in Hooten v. State, 492 So.2d 948 (Miss. 1986), the circuit court had refused to permit a woman whose expertise was "grapho analysis" to testify as an expert that certain handwriting had not been made by the defendant. We reversed.
The lady had testified that she was an expert in "grapho analysis," a word that in 1986 did not appear in any of the conventional dictionaries.[4] She was a high school graduate who had taken a correspondence course on this subject, following which she received a "Master's Degree" from the "International Grapho-Analysis Society Institute" in Chicago. This field of specialty is supposedly aimed at learning traits of character from examination of handwriting. Is the person mean, a chiseler, or a murderer? Does the person think fast or slowly? Is the person a homosexual? etc., etc. Professor M.N. Bunker (no, that is really his name) is the founder of this renowned Chicago "Institute," and author of its "bible," The Science of Determining Personality by Graphonalysis, which tells you how to acquire all these marvelous abilities.
There is no scientific data anywhere validating the preposterous claims of Professor Bunker, or that a "grapho analyst" can detect these character traits, much less qualify in the highly specialized field of determining whether or not an individual did indeed write certain handwriting being questioned.
Yet we reversed, holding this lady was competent as a matter of law to testify and as such an expert, and her credibility was for the jury to assess.[5]

IVY
In Ivy v. State, 522 So.2d 740 (Miss. 1988), Dr. Ray Lyle, a pediatrician, was called to the emergency room of the Starkville hospital. He examined a little girl five years of age, who had blood on her head and clothes. At the trial of the stepfather Ivy for aggravated assault (child abuse), Dr. Lyle testified that while children in such a situation were usually fearful or upset, this little girl was "strangely subdued and even passive," and so caught his attention. He further testified that this either indicated a *1159 superbly mature little girl for her age or a depressed little girl and so fearful that she was not excited. The doctor was then asked, "And is this consistent with child abuse?" Over objection that this was invading the province of the jury, the doctor testified, "It is one of the findings in a child that makes me worry about child abuse certainly if it's in association with an injury."
We rejected the argument on appeal that such an opinion was without the doctor's specialty, holding that it was waived, because this particular ground for the objection had not been specified in the objection. Mississippi Rules of Evidence 103(a)(1):
It is only logical that the appellant cannot now claim that the trial judge did not anticipate the correct ground for the objection. Baker v. State, 327 So.2d 288, 295 (Miss. 1976); see Stevens v. State, 458 So.2d 726, 730 (Miss. 1984) (applying the rule even to Fourth Amendment claims) Gill v. State, 485 So.2d 1047, 1051 (Miss. 1986). [Emphasis added]

522 So.2d at 743.
It did not occur to this Court that admitting this opinion testimony was "plain error affecting substantial rights" under 103(d) of this rule.
Moreover, we declared the opinion was proper in any event.
[T]he doctor could still have given his opinion based on his prior experience with children in the emergency room. Miss.R.Evid. 702. Such a determination necessarily involves the exercise of a certain amount of discretion on the part of the trial judge... . In federal courts the qualification of an expert lies within the sound discretion of the trial judge, whose ruling will not be overturned in the absence of clear abuse. 3 Weinstein's Evidence 702 ((04)) (1987). There is no merit to this assignment. [Emphasis added]

522 So.2d at 743-744.
The opinion in Ivy does not disclose anything about Dr. Lyle's experience with children in the emergency room, or in what manner. Because her professional qualifications were stipulated and not objected to, neither does the record in this case tell us how many victims of child sexual abuse Dr. Chidester had seen. On cross-examination she testified, "I have had a tremendous amount of experience in child sexual abuse," and defense counsel was wise enough to let the matter drop there.
In Ivy the doctor gave a professional opinion that the five-year-old child's unusual behavior indicated some kind of sadistic child abuse by an older person. We held that it was proper, and certainly within the trial court's discretion.
In this case, a treating physician from her examination and observation of a 14-year-old child gave the professional opinion that the unusual behavior of her patient to her indicated "she had been sexually traumatized in some way."
Why is a treating physician qualified to give his opinion that a child's behavior (not her accusation) can indicate her wounds were received as a result of child abuse, but a treating physician cannot give her opinion that a child's unusual behavior indicates being "sexually traumatized in some way"?
The first results from a sadistic personality, the second from a sexually deviant personality, both very sick minds.
And why, if the error is waived because of improper objection in Ivy, is an improper objection in this case plain error which "`affected' Goodson's right to a fair trial" and requires reversal in this case? (Majority Opinion, p. 1148) A simple objection as made here, stating no grounds, is insufficient to support any claim of error upon appeal. Dranow v. U.S., 307 F.2d 545 (8th Cir.1962).

HOSFORD
The majority's citation of Hosford v. State, 560 So.2d 163 (Miss. 1990), as authority for its position can only cause wonderment to any person familiar with the record in that case. It is about as strong an authority for precisely the opposite conclusion as one could envision. Hosford was prosecuted for sexual battery upon his eight-year-old stepdaughter.
*1160 At trial the little girl testified, and then Brenda Chance, a child therapist who had seen and counseled her, testified. Chance is not a medical doctor. The child had related to Chance that she had been sexually molested by her maternal grandfather, by an uncle, and also by her stepfather Hosford.
The circuit court gave defense counsel a continuing objection to Chance's testimony. Based solely upon her interviews with the child, over defense objections, Chance testified she had no doubts that the child had been "sexually abused, chronically," and that "There have been multiple offenders in my opinion."
Then she gave her opinion that the child was not confused and had correctly identified Hosford as the perpetrator of this particular crime. Hosford was more "threatening" to her. In this particular instance of sexual abuse, Hosford, the stepdaddy, was the one who did it, according to Chance.
I will not burden the body of this opinion with Chance's testimony, but excerpts are set forth in an appendix.
In Hosford we said Chance's testimony "treads close to the brink of reversible error," but since it came "in direct response to the defense assault on the credibility of the victim" (Hosford, at 166) and as a result of "impeachment of the victim on cross-examination," "Chance's brief testimony" (brief indeed) "did not rise to the level of bolstering and is not reversible error." Hosford, at 167) And, "In sum, the testimony of Chance, of which Hosford now complains, was admissible as evidence to rebut a charge of recent fabrication or confusion  suggestions made during the defense counsel's cross-examination of the victim." [Emphasis added] Hosford, at 168.
The trial pattern between Hosford and this case are strikingly similar. As in Hosford, here the victim Sonya first testified. Defense counsel did everything he could in his cross-examination to impeach her testimony, and attack her credibility, that she was fabricating or lying, and with all the persistence and vigor as shown in Hosford. Likewise, as in Hosford, in this case the examining physician testified following the victim's testimony. Far less "bolstering," under any objective view of the record, occurred by Dr. Chidester's simple opinion than the extensive observations made by Chance that in her opinion in this particular instance the stepdaddy committed the crime, when it admittedly could have been others as well.
Yet in Hosford the "bolstering" was proper in response to the victim's cross-examination, but in this case a much milder opinion was not only error, but requires reversal. Why the difference?
The majority also complains that Dr. Chidester was not shown to be qualified to express any such opinion. Well, in Hosford we quite correctly held that because Hosford had not made the proper objection to Chance's credentials, he waived the objection, citing Ivy, supra. Hosford, at 168, 170. In this case no objection as required by Rule 103 was made, but the majority holds admitting her opinion was plain error which "`affected' Goodson's right to a fair trial. Rule 103(a), Miss.R.Ev." (Majority Opinion, p. 13). And reversible error. Why the difference?
Finally, in Hosford where a child therapist did indeed expound at length on the opprobrious "child sexual abuse profile" and had "no doubt" the child was a victim of child sexual abuse, this Court held that under the "unusual facts" of that case it was "harmless error." Here, however, the opinion of Dr. Chidester is reversible error.
I congratulate the majority's brazen intrepidity to assert "Hosford commands reversal here." (Majority Opinion, p. 1147)
The majority changes the rules and makes new ones as it goes along.
Sonya testified that Goodson started having sex with her when she was about eight, ejaculating, and then telling her not to tell anyone or he would hurt her or her family, but to go to sleep. Sometimes it happened in her home when her parents were gone, sometimes in his trailer.
It is apparent the majority does not believe the State made a strong case. I have *1161 a different view. It may be encompassed in Sonya's testimony about the last time, in 1982, for which Goodson stood trial:
Q. All right. Tell the ladies and gentlemen of the jury about that time.
A. That  I really can't remember much about it except that it happened. When he  after it happened a couple of times, I would physically be there but mentally I would be somewhere else; so, I can't really remember.
Q. What do you mean by that, Sonya?
A. I would like be thinking of me with my friends doing something else. I would just wholly block it out, I mean, because it hurt me so bad. I would just, like, be somewhere else, really.
(R.97)
These words, coming from a child, expressing the human response to pain, suffering and degradation are as strong corroboration of the truth of her testimony as can be envisioned. Could she fabricate this psychological defense mechanism?
It strikes me as odd indeed for a Court claiming to have knowledge of human experience to see fit to completely ignore this testimony in finding Dr. Chidester's mild opinion reversible error, but in Hosford for more damning opinion harmless.

COMPETENCY OF MEDICAL DOCTORS
I am as interested as the next judge in the impartial, objective examination of all criminal cases, and this includes criminal prosecutions for child sexual abuse.
The recognition, however, that there may very well be, and probably are zealots and misguided individuals behind some cases does not blind me to the fact that child abuse does indeed take place. It has been a recognized aberrational phenomenon by doctors for at least a century, is well documented in hundreds of books on psychology, medicine, and psychiatry. There were no witches in Salem, Massachusetts. Child sexual abuse is a recognized national problem. Society's attempt to protect our children is not exactly a witch-hunt as the majority seems to be convinced.
Evidence in these cases should be examined within well-settled principles of law governing the admission of expert testimony, rather than devise rules of our own as we go along.
Dr. Chidester rendered a medical opinion based upon first-hand observation and her examination of a patient. It was so squarely within the qualifications of a medical doctor to make that if it had been made in any other context than a child sexual abuse case it would not have raised a single majority eyebrow.
Courts have historically given the medical profession great deference as to opinions involving medical science and patients under their care. It would be fatuous to suggest that average physicians in their daily practice do not encounter mental as well as physical illnesses and treat them. As they deem proper or necessary they may in turn refer patients to more specialized physicians, but as practicing physicians they certainly have the capacity to recognize symptoms of mental or behavioral disorders of multiplied variations. General practitioners are authorized by law to prescribe drugs for all kinds of mental and emotional disturbances. "[T]he average attending physician is permitted to state an inference or opinion with respect to the mental capacity or condition of a person observed by him." 32 C.J.S. Evidence, § 546(101), p. 384.
A regular practicing physician is usually regarded as qualified to give an expert opinion as to the mental condition of a patient under his care.
An observing witness as to mental capacity or condition must have had adequate opportunities for observation, but it is not necessary that he should be specifically skilled in the subject of mental disorders, or that he be the attending physician, or that he be a psychiatrist.
32 C.J.S. Evidence, § 546(101)(c), pp. 391-392.
An attending physician may give his opinion as to the mental condition of his patient without anything more appearing than that he is in fact the attending physician.
*1162 Greene v. Cronin, 314 Mass. 336, 50 N.E.2d 36, 40 (1943). See also, In re Richard, 655 S.W.2d 110, 113 (Mo. App. 1983); Hagen v. Swenson, 306 Minn. 527, 236 N.W.2d 161 (1975); Arndell v. Peay, 411 S.W.2d 473 (Ky. 1967); Lantini v. Daniels, 104 R.I. 572, 247 A.2d 298 (1968); Trout v. Gandy, 424 P.2d 52 (Okla. 1967); In re Estate of Faris, 159 N.W.2d 417 (Iowa 1968); Matter of Aaron, 417 So.2d 105, 107-108 (La. App. 1982).
Indeed, when based upon their personal observation, and after relating behavior observed by them, it has been long settled that lay witnesses may express an opinion, based upon their observations, as to the mental condition of a person. In re Atkinson's Estate, 224 Miss. 344, 80 So.2d 12 (1955); Hickey v. Anderson, 210 Miss. 455, 49 So.2d 713 (1951) Gathings v. Howard, 122 Miss. 355, 84 So. 240 (1920).
It is likewise settled that a practicing physician in a criminal case may express an opinion as to the mental condition of the accused, and whether he knew the difference between right and wrong. Lewis v. State, 209 Miss. 110, 46 So.2d 78 (1950); 23 C.J.S. Criminal Law, § 867 c., p. 423.
This Court has gone further. We have consistently held that in criminal cases, when based upon their observation, non-expert lay witnesses may express an opinion as to the mental condition of the accused and whether he had the capacity to know the difference between right and wrong.
In Porter v. State, 492 So.2d 970, 973 (Miss. 1986), we held:
This Court has held many times that lay testimony, as well as expert testimony, is admissible to prove a defendant's mental capacity to distinguish right from wrong at the time the crime is committed.
See also, Harvey v. State, 207 So.2d 108, 117-118 (Miss. 1968); McGarrh v. State, 249 Miss. 247, 148 So.2d 494 (1963); Keeler v. State, 226 Miss. 199, 84 So.2d 153 (1955).
I will ask the reader, which is a more difficult question to answer from a person's behavior, whether she had the mental ability to know the difference between "right" and "wrong"? Or, whether the unusual behavior of the person may or may not indicate that at some time in her past she has had a painful experience involving her very intimate and private sex organs?
If a medical doctor, who makes her living treating people, and who has examined and treated "an awful lot of child sex abuse cases" cannot express this simple opinion, then we have gone far indeed.
When we think of the term "child sexual abuse" we envision a much older person in some way engaging in sexual activities with a child. The child has been victimized by an older person sexually. (See, Footnote 6, infra, defining child sexual abuse.)
This doctor gave an opinion that Sonya's behavior indicated a memory of a painful experience involving her sex organs. One of several possibilities could have been, of course, child sexual abuse, but not necessarily. She could have had a painful memory of being sexually traumatized in a manner unconnected with child sexual abuse, and this is all the doctor opined.
One could ask the majority, what did the behavior indicate:
(1) Was Sonya insane?
(2) Was Sonya neurotic?
(3) Was she malingering or exaggerating?
(4) Was she simply hyper-active?
(5) Or, did it indicate a painful memory? If so, of what?
To assert that a practicing doctor of medicine does not have the competency from a one-hour and forty-five minute first-hand observation, examination and consultation with a patient to make a professional differential diagnosis among these possibilities is absurd.
Defendant is correct that under Federal Rules of Evidence 702, an expert must possess some specialized knowledge of the field in which he purports to be an expert, but defendant is incorrect insofar as it challenges the experts here for not having specialized knowledge as to the specific question at issue. See C. McCormick, Evidence § 13, at 30 & n. 70 (E. Cleary ed. 1972). We have said that a physician is qualified to give an opinion as to the mental health of someone even *1163 if he is not a psychiatrist. Alvarado v. Weinberger, 511 F.2d 1046, 1049 (1st Cir.1975). The fact that the physician is not a specialist in the field in which he is giving his opinion affects not the admissibility of his opinion but the weight the jury may place on it. Alvarado, 511 F.2d at 1049. .. .
Payton v. Abbott Labs, 780 F.2d 147, 155 (1st Cir.1985).
The chief question that occurs here is whether a general practitioner [emphasis original] may testify on matters of a particular department of the science wherein specialists may presumably be had. Here the courts seem not to have taken a sufficiently firm stand against the narrow objections frequently raised. It is not that the rulings themselves are illiberal, but that narrow doctrines are not repudiated with sufficient positiveness. The liberal doctrine should be insisted on that the law does not require the best possible kind of a witness, but only persons of such qualifications as the community daily and reasonably relies upon in seeking medical advice. Specialists are in many communities few and far between; the ordinary medical practitioner should be received on all matters as to which a regular medical training necessarily involves some general knowledge. [Emphasis added]

Wigmore on Evidence, § 569, (Chadbourne Rev. 1980); also see Jones on Evidence, Civil & Criminal (1972).
The entire thrust of the majority is that there are no behavioral guides from which an expert can validly form an opinion that these are consistent with, or indicative of child sexual abuse, that such symptoms cannot be reliably considered in putting together the pieces of the puzzle. This, as above noted, is simply incorrect, and I find it puzzling that the majority has extensively cited Myers, et al, "Expert Testimony in Child Sexual Abuse Litigation," supra, as authority for such notion.
Both the legal and medical authors of this treatise, I respectfully suggest, will be astonished at this view, as they would be reading the record of Dr. Chidester's physical examination and consultation, the history Sonya gave of her uncle raping her, and the time spent, that nevertheless this medical doctor could not validly express the opinion she did.
The majority's first quote from the article is that courts should proceed cautiously and see that the professional is highly qualified. (Majority Opinion, p. 1145) No one can disagree with this general statement. From this record, her professional qualification never having been objected to or challenged at trial, or even in Goodson's brief on appeal, Dr. Chidester by operation of Rule 103(a) M.R.E. is qualified before this Court on appeal.
Then, the majority quotes the following sentence from Myers, et al., p. 85:
Because of the disagreement among experts on child sexual abuse, and because of the consequences of criminal conviction, it may be appropriate in criminal jury trials to eschew behavioral science testimony cast in terms of a direct opinion that sexual abuse occurred. [Emphasis added]

(Majority Opinion, pp. 1146-1147)
Let us continue with the rest of the paragraph:
However it may be proper to permit one or more of the alternative forms of expert testimony discussed earlier. In particular, it may be appropriate to permit a properly qualified expert to testify that a child demonstrates age-inappropriate sexual knowledge or awareness. Furthermore, it may also be proper to permit an expert to state that a child's symptoms and behavior are consistent with sexual abuse. [Emphasis added]

Did Dr. Chidester state, "In my professional opinion this child has been sexually abused"? No, except in the heads of the majority. She did say her behavior was "indicative" (consistent) with having been "sexually traumatized" (not even child abused sexually) in some way.
The majority states that Sonya's reaction to being examined "is not among the factors researchers have found particularly probative of sexual abuse." (Majority *1164 Opinion, p. 1147, citing Myers, p. 75) Indeed.
Symptoms of anxiety are commonly reported in sexually abused children. Clinical studies describe various anxiety reactions such as fear, sleep disturbance and nightmares, flashbacks, startle reactions and hypervigilance, regression, phobic behavior, withdrawal from usual activities, nervousness, and clingyness. [Emphasis added]

Myers, p. 60.

Was Sonya afraid, hypervigilant, nervous?

The Random House Dictionary (Unabridged) defines "phobia" as "a fear or anxiety that exceeds normal proportions or that has no basis in reality; an obsessive or irrational dread." If this child's reaction to a female medical doctor examining her in the presence of her own mother did not exemplify "phobic behavior," what does?
Myers, p. 36, "I. Clinical Scientific Information" [beginning with the sentence]: "Among physicians, child sexual abuse is a recognized medical diagnosis."[6]
Finally, under "B. Behavioral Science Testimony Describing Behaviors Commonly Observed in Sexually Abused Children," I will simply give the beginning and ending sentences, pp. 51, 61-62:
Many sexually abused children demonstrate behavioral, cognitive, and emotional reactions to their abuse. Expert testimony describing such behaviors serves several purposes. In some cases, expert testimony describing behaviors commonly observed in sexually abused children constitutes substantive evidence of abuse.
While no symptom or set of symptoms is conclusive proof of sexual abuse, when symptoms evidencing abuse are present in conjunction with a report that bears indicia of reliability, the clinician is justified in forming a clinical opinion that a child has been sexually abused.
Of course, a medical doctor who treats and counsels sexually abused children, and who has taken a history from a child of being repeatedly raped by an uncle, who upon making an anal penetration of the child is told that was how it felt when the uncle penetrated her, might very well feel competent to pass an opinion as to what her unusual behavior prior to disrobing for the physical examination meant to her as a doctor.
Thus does the majority denigrate the medical profession.

STATE'S CASE
The majority's bias can be seen from its one-sided examination of the State's presentation of this case.
"What is glaringly absent is what, in Dr. Chidester's experience, suggested to her that Sonya's reaction was indicative of sexual abuse." [Emphasis added] (Majority Opinion, p. 1147)
In sum, the record falls far short of establishing that Dr. Chidester had the professional competence in the field of child sexual abuse to give the opinion at issue with the level of reliability Rule 702 *1165 and our law demand of evidence offered at trial.
(Majority Opinion, p. 1147)
If the majority were dispassionately fair it would have to acknowledge that these so-called "deficiencies" it strains to find in Dr. Chidester came about because they were not challenged or raised by the defense.
At trial when Dr. Chidester was asked what Sonya's behavior indicated to her as a doctor, defense counsel responded, "Your Honor, we object. It's improper." The majority well knows that under Rule 103(a)(1) defense counsel was required to give a specific ground for his objection, and having made only a general objection, he waived any claim of error. U.S. v. Johnson, 722 F.2d 407 (8th Cir.1983); Ivy, supra; Hosford, supra.
Had defense counsel objected on the ground that Dr. Chidester lacked the training or qualifications to express such an opinion, or requested to voir dire her on her qualifications, as he was required to do in order to assign this as error, we would have a record. Had he claimed such an opinion was beyond medical science, Dr. Chidester could have responded to this as well.
The majority also knows that not to require defense counsel to be specific in making objections permits, indeed encourages, defense "sand-bagging." Why should counsel be specific and give the State an opportunity to make a record on the issue when the Supreme Court will take care of his client on appeal?
And of course, in Ivy and Hosford the accused was not permitted to complain on appeal of improper opinion evidence because the correct ground for objecting was not specified, but here the opinion was "plain error" and deprived Goodson of a "fair trial." And therefore reverse. (Majority Opinion, p. 1148)
The majority does not stop with the State's trial counsel, but has this to say about appellate counsel: "Of significance, the prosecution in its brief on appeal makes no effort to defend Dr. Chidester's qualifications as an expert." (Majority Opinion, p. 1145)
This likewise is biased and one-sided.
Goodson's brief is meager. Here is his third assignment of error:

DID THE COURT ERR IN ALLOWING DR. LINDA CHIDESTER TO GIVE HER OPINION THAT THE PROSECUTRIX WAS TRUTHFUL AND HAD SUFFERED SEXUAL TRAUMA?
Under this assignment covering one and one-fourth pages double spaced, he states Dr. Chidester "overstepped her bounds when she stated (1) that she believed the minor child to be truthful when she had no expertise nor did anything from a medical standpoint to make such a bold and rash statement." He neglects to add that this opinion was brought out by defense counsel, himself, on cross-examination. And as to the error which the majority has seized upon and reverses, here is the sum total of what Goodson states in his brief under his assignment:
Further, she (Dr. Chidester) had nothing to base her opinion upon that the victim had been sexually traumatized other than to base that opinion upon the actions and statements of the prosecutrix, and under our law is clearly inadmissible.
(Appellant's Brief, p. 13)
Does Goodson claim Dr. Chidester in fact did not have the professional qualifications to give such an opinion? No. Does he claim such an opinion is beyond medical science? No. Does he give the Court the first legal authority for what he did claim? No. See, Read v. Southern Pine Electric Power Ass'n., 515 So.2d 916, 921 (Miss. 1987); Devereaux v. Devereaux, 493 So.2d 1310 (Miss. 1986); Wood v. Gulf States Capital Corp., 217 So.2d 257 (Miss. 1969); Miss.S.Ct.Rule 28(a)(6).
I was of the opinion that all the State was required to do was to answer the appellant's brief.
Yet the majority unfairly chides the State for not anticipating all the objections which the majority has of its own volition raised.
*1166 Thus the majority demonstrates that in child sexual abuse cases it is not necessary for defense counsel to make the proper objection at trial, or to cite legal authorities, or even to precisely or correctly state his complaint of error on appeal. A generalized broad-side will get him into the majority's ball park. Indeed, we have demonstrated that in these cases it is not even necessary that the claim of error be assigned at all, we will pick one of our own. Hall v. State, 539 So.2d 1338 (Miss. 1989).
The majority changes the rules and makes new ones as it goes along.

THE MAJORITY DOES NOT LIKE DR. CHIDESTER
The majority opinion is a recurring complaint of the record's failure to give Dr. Chidester's specialized qualifications to give that simple professional opinion. Never once does the majority concede that the reason no more is given is because the defense did not care to object to her lack of qualifications, or pursue the topic with her on cross-examination.
It even attacks her credibility. "If she has had a `tremendous amount of experience in child sexual abuse' but has `never had one cry before,' common sense casts doubt on the credibility of Dr. Chidester's opinion that Sonya's crying was an indication that she had been sexually abused." [Emphasis added] (Majority Opinion, p. 1147) The majority picks one and ignores the other facts upon which Dr. Chidester based her opinion. Is this fair?
The majority goes even further and tells us that even though she has all kinds of credentials, this Court still might reject her opinion as a matter of law. (Majority Opinion, p. 1146) The majority doubts if any expert could validly have such an opinion. It will not be the medical profession in this State, which treats diseases and illnesses and prescribes medicine, which decides whether such an opinion is trustworthy. Instead, it will be this Court, based upon its own "expertise" on the subject, which will make the decision.
I would much rather trust the judgment of the medical profession on this subject than members of this Court. The majority makes its own judgmental citation of authority, and that which is dispositive is that which the majority claims agrees with it. I have no apprehension of what the majority has read, it is the knowledge the majority has from some source other than the printed page which concerns me.

THE MEANING OF "INJURY"
Sonya was born January 24, 1972.
Goodson was married to Barbara Goodson, the sister of Sonya's father. The Goodson family and Sonya's family were quite close when they lived in Iuka in the early 1980s, especially Sonya's mother Ann Marie May and Mrs. Goodson. Thereafter, the May family lived in other parts of the United States until they returned to Iuka in 1986. The Goodsons, who had lived in a trailer, moved into the May home when the May family left Iuka in 1982.
On February 8, 1986, Mrs. May was making plans for her niece, whose parents had separated, to live with them temporarily. She was explaining to Sonya and her younger sister that the niece should feel free to discuss with them any encounter with drugs or some adult approaching her. While she was talking in this manner with her daughters, Sonya told her that she had been sexually abused and molested by Goodson four years previously. This was the first time Sonya had told her parents.
At the time Goodson was charged with raping her, Sonya was ten, and she was fourteen when she reported the event to her mother.
Dr. Chidester examined Sonya August 22, 1986, some four and one-half years after the time Sonya said she had been raped. Dr. Chidester found no hymenal ring, a "piece of tissue in the vaginal opening," and "usually present until puberty." She testified the tissue could be lost for various reasons, sexual intercourse being one of them. Some girls did not have a hymenal ring and others lost them from causes other than sex, such as riding a bicycle or horseback riding. She said nothing about an "injury."
*1167 Sonya, a young girl at the age of puberty when examined, had no hymenal ring. If she ever had one it could have been lost by any number of incidents, sexual intercourse being but one of them.
Had Dr. Chidester found a hymenal closure, this would certainly have been strong proof of Goodson's innocence. The absence, however, in a fourteen and one-half year old child was of minimal significance in this case. It certainly had far less significance than it would have had for a six-to sixteen-year-old child. It proved very little, and certainly was no evidence of Goodson's guilt.
Goodson sought to prove that Sonya had admitted to Chris Garner, a boyfriend, of having some kind of subsequent activity. It was elicited as follows in an offer of proof in chambers:
Q. Did you know [Sonya] when she moved back to Tishomingo County in January or February of 1986?
A. Yes, sir, I did.
Q. Did you have any discussions with her at that time pertaining to any sexual activity she had had while she lived up North.
A. Yes, sir.
Q. What was that?
* * * * * *
A. Yes, she had  we got to talking about it one day and she said that she had with one of her boyfriends.
(R.189)
The circuit judge excluded this testimony.
In doing so the circuit judge clearly followed Rule 412 MRE.[7] Prior to trial defense counsel, as provided by 412(c)(1) made a motion to allow this evidence, and the judge conducted a hearing in chambers, following which he excluded it.
Under 412(c)(3) the only basis for admission, if otherwise competent, would have been a determination by the court "that the probative value of such evidence outweighs the danger of unfair prejudice." Since the circuit judge failed to make this finding, this should end the matter, the majority at no place holding that he abused his discretion in doing so.[8]
Here again, however, the majority takes pains to change the meaning of the word "injury" and thereby change a rule as it goes along. As noted, the Mississippi Rules of Evidence were adopted from the Federal Rules of Evidence, and many of *1168 them are copied verbatim. Federal Rule 412(b)(2)(A) reads in part:
... past sexual behavior with persons other than the accused, offered by the accused upon the issue of whether the accused was or was not, with respect to the alleged victim, the source of semen or injury. [Emphasis added]

Our Rule 412(b)(2)(A) is identical, except we added two more exceptions, "pregnancy" and "disease" to "semen" and "injury." Clearly the Federal and Mississippi rules did not say the competency of such evidence depended on whether or not the accused was the source of any physical condition or change in the victim's body. Or, that absence of a hymenal ring authorized this evidence. The rule clearly could have stated this, but did not.
One United States Court of Appeals decision on this specific question is squarely in point. In fact, it is the only case authority cited by the majority directly on point.
In U.S. v. Shaw, 824 F.2d 601 (8th Cir.1987), cert. den. 484 U.S. 1068, 108 S.Ct. 1033, 98 L.Ed.2d 997 (1988), Shaw was convicted of engaging in numerous acts of sexual intercourse with his eleven-year-old foster daughter. The physician who examined the child testified that the condition of her hymen "indicated that S.A. had engaged in sexual intercourse." Shaw filed a pretrial motion proffering evidence that seven young boys would testify that they had sexual intercourse with the child, and one would testify he had intercourse with her fifty times. The district court rejected this evidence.
The court of appeals held that the exclusion of this evidence was not error. The court found that the absence of a hymenal ring was no evidence of an injury. From the witnesses in the case, the court concluded that the hymenal ring was a stretch tissue, and that as a child grew older, the hymen through normal growth would open up. It could be stretched from a number of different causes.
The testimony, in sum, indicated that S.A.'s hymen was not intact; it had been stretched; her vaginal orifice was widened. Even if this physical condition was the result of sexual intercourse, it is not an injury. Unlike a situation where the evidence indicates, for example, that sexual intercourse caused a tearing or bruising of the hymen or unusual bleeding, the evidence concerning S.A.'s hymen, while it may describe a physiological accommodation, falls short of establishing an injury so as to trigger the applicability of Rule 412's injury exception.
824 F.2d at 601.
The court recognized the commentators cited in the majority opinion which would hold the absence of a hymenal ring to be an injury. The court concluded, however, from the Congressional comments in passage of Rule 412 by Congress in 1978 that it was the intent of Congress to limit such testimony to cases of an injury in the commonly accepted meaning.
... the "injury" exception allows a court to deviate from Rule 412's general rule only when the evidence establishes an injury  such as a cut, bruise, or tear  that was sustained reasonably close in time to the alleged rape. The physical consequences to S.A.'s hymen  a consequence that could have been caused by sexual activity a substantial amount of time before the alleged acts of sexual intercourse with Shaw  does not satisfy this criterion. [Emphasis added]

In construing the meaning of Rule 412(b)(2)(A), a court "must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." ... Our review of the legislative history of Rule 412's injury exception convinces us that Congress had no intention to expand the commonly understood meaning of the word "injury" to include all physical consequences. We thus hold that the district court did not err in excluding evidence of S.A.'s past sexual behavior.
824 F.2d at 608.
And what does the majority have to say about this only case it cites directly in point? It is "simply wrong." (Majority Opinion, p. 1152)
*1169 Of course, the majority's entire complaint on this issue is that when evidence has been introduced that a female has no hymenal ring, that should be, that ought to be considered an "injury." Well, if that is the case, the majority should amend the Rule to include "semen, pregnancy, disease, or injury, or any physical condition or change in the victim's body." Unlike Federal Courts, this Court has declared the Legislature has nothing to do with Rules of Evidence. Hall v. State, supra. It can make them and amend them as it chooses. Instead of stretching the ordinary meaning of a word as we go along, the majority should simply announce it is changing the Rule to include "absence of hymenal ring." In this way, at least, the meaning of words will be clear.
The majority's handling of "injury" is but another sample of the majority's making its own rules as it goes along.[9]
I would affirm the circuit court judgment, and I respectfully dissent.
ANDERSON, J., joins this opinion.

APPENDIX A

EXCERPTS FROM MRS. BRENDA CHANCE'S TESTIMONY FROM TRIAL RECORD IN

HOSFORD V. STATE, 560 So.2d 163 (Miss. 1990)
BY MR. HAMILTON:
Your Honor, let me have a continuing objection to her testimony.
BY THE COURT:
Let the record show. Bring them out.
(Whereupon the Jury was brought back out and seated in the Jury Box, and the Direct Examination of the witness continued as follows:)
BY MR. HARKEY:
Q. Why was she referred to you?
A. She was referred from the Methodist Children's Home where she is now placed because it was suspected that she had been sexually traumatized, but she was also having some behavioral acting out at the home and they felt like she needed to be evaluated and treated.
Q. When you say acting out, what do you mean?
A. Acting out some behaviors at the Children's Home, and they felt like this could be due to some experiences she had had in the past. So she had been referred for assessment and then to determine whether or not treatment was indicated.
Q. You said traumatized, sexually traumatized. What do you mean by traumatized?
A. Psychologically damaged, harmed.
Q. Injured?
A. Yes.
Q. As trauma to the body would be a bruise or something?
A. Right.
Q. That's the sense you mean it in?
A. Yes.
Q. What type of behavior in a general sense as briefly as you can, Mrs. Chance  What type of behavior is exhibited by children who have been sexually abused?
BY MR. HAMILTON:
Objection, Your Honor.
BY THE COURT:
Overruled.
BY MR. HARKEY:
Q. Briefly.

*1170 A. Briefly, many times you see that they have adapted the role of an older person who enters into adult relationships with males. They act out sexually with adults. Many times they appear slow, somewhat retarded. They are depressed. They have a sexual knowledge which is far to sophisticated for a child of their developmental age. They are acting out with other children sexually. It is not the normal type of playing doctor, let me see type of play, curiosity. It is for the goal of achieving sexual satisfaction  to have an orgasm. They have been many times so exposed to sexual types of contact from their caretakers that they absolutely cannot separate what is normal affection and what is sexual. They do not know how to go about getting affection in normal ways. They use terminology which is their own.
Q. They use terminology which is their own. Explain that?
A. Okay, they use terminology which would be that characteristic of a child. They don't use the adult terms of vagina, penis, orgasm. Things like this are not words that they are familiar with generally, young children. They use their own words like these children did, such as bootie, and tutu and things like that for the private parts. Many times they appear afraid of returning home.
Q. Do they question any boundaries of their physical limitation?
A. No. That's what I was referring to.
Q. Go ahead.
A. The question was do they place any physical boundaries. No. If they had been intruded by adults, if their bodies have been intruded chronically and they have not been taught that their bodies are private, their bodies are sacred, and that they have the right to say no, and if they have been encouraged to play games with other adults then they think nothing of intruding another person's body. Such as in the process of holding that child and cuddling that child, they think nothing of touching their private parts. They think nothing of reaching in the panties or pants of another child.
Q. What type of history did you obtain through your discussions with Tabitha and other agencies?
A. I received 
BY MR. HAMILTON:
 I didn't hear the question. Tabitha and what?
BY MR. HARKEY:
Other agencies.
BY MR. HAMILTON:
Your Honor, that's all hearsay. It is strictly hearsay.
BY MR. HARKEY:
Judge, under the rules 
BY THE COURT:
I will let her go ahead and answer it. Overruled.
BY MR. HARKEY:
Q. Go head.
A. Okay. In obtaining a history I always gain a medical history and a family history. In this case I did also. I received the complete agency reports from the Welfare Departments that had been involved with this family. I received medical reports, and I received what I could from all five children.
Q. Okay. Did you talk with Tabitha specifically on 20 or more occasions for an average of one hour each?
A. Correct.
Q. What type of behavioral symptoms did Tabitha exhibit that you have been able to determine she has exhibited?
A. Okay. There has been excessive sexual acting out with other children. Rather than being interested in social learning, academic learning, and being involved in things that are in school she has been excessively interested in sexual play with other children, exposing *1171 herself to other children, touching herself in front of them, touching other children, excessive masturbation. In her interviews with me she has been very very explicit. She knows in detail about the stages of penil arousal and erections, ejaculation, taste of semen, etcetera. She knows specifically these details. She is able to identify and tell me in a very explicit and consistent manner over multiple interviews exactly what has happened to her by different offenders. She manifests the emotion that goes with this. You don't teach a child to act and have the emotion that goes with this. She has the emotion. She has a history of 
BY MR. HAMILTON:
 We object to that conclusion, Your Honor, and ask that the Jury be instructed to disregard it.
BY THE COURT:
Overruled. Go ahead.
R. 72-76
BY MR. HARKEY:
Q. Based upon your training and experience and education in the field of child therapy and your counseling sessions with Tabitha, do you have an opinion as to whether or not she has been abused?
A. I have no doubt she has been sexually abused.
* * * * * *
Q. Repeat your answer.
A. I said I have no doubts that she has been sexually abused, chronically.
Q. Your opinion of the sexual abuse, is it with one person or has it been other perpetrators?
A. There have been multiple offenders in my opinion.
R. 77
Q. Have you been able to differentiate between the several perpetrators and, if so, how?
A. Okay. She has been with me over a period of time. And this is the importance of multiple interviews, for the child to be very comfortable and to feel safe. And at that time it was during about the 4th interview that she began divulging details about the abuse. And she began telling me about perpetrators who were in my opinion less threatening, and then eventually came to the point where she was able to describe to me a perpetrator who she felt was the most threatening of all.
Q. Who was the most threatening to Tabitha?
A. She was most afraid to identify Billy Hosford.
* * * * * *
Q. What was her behavior when she was doing this? How did she act?
A. Reluctant?
Q. Reluctant. She said she wasn't sure she should be telling me that. She was afraid that she would be getting him in trouble, that she would be sent away, that he would be sent away, that her mother would be angry.
BY MR. HAMILTON:
Your Honor, for the record we enter a continuing objection to all of this.
BY THE COURT:
Overruled.
BY MR. HAMILTON:
Your Honor, the State has never supplied any of this information to us.
BY THE COURT:
Overruled. Go ahead.
BY THE WITNESS:
She also was fearful that he would punish her.
BY MR. HARKEY:
Q. Fearful that what?
A. That he would punish her.
Q. And why was that? Why was she more threatened of Mr. Hosford than the other individuals she named to you?
A. For one thing her prior experience of the punishment, and also that he was the primary caretaker. She had to rely on him to take care of her. If she told, he was the one that she was primarily relying on all this time. She *1172 also had been put in the role of being kind of a mother in this family, which is what happens in families of sexual abuses. They feel like they have to protect and they have to be responsible for all the needs and all the feelings of the parents.
Q. What you are saying is she had to feel like she was the parent?
A. Yes. Children who are victims of sexual assault will many times subordinate their needs. It doesn't matter if they hurt. It doesn't matter if they cry. It doesn't matter what their needs are, these are always below the needs of the parent. And that is what is of most importance, that they take care of the parent.
Q. Did you find these behavioral symptoms in Tabitha?
A. I did.
Q. Based upon these symptoms and her feelings toward them, would it be unusual that she would not divulge Billy Hosford as being one of the perpetrators? Is that unusual?
A. No. It would be unusual if she did divulge this for a number of reasons.
R. 78-80
Q. Based upon your educational background and your counseling sessions with Tabitha, do you have an opinion as to the possibility that Tabitha has confused Billy Hosford with any other individuals who have victimized her?
BY MR. HAMILTON:
Objection, Your Honor.
BY THE COURT:
Overruled.
BY THE WITNESS:
No, I do not.
Q. Do you have an opinion?
A. I don't think that she has confused what has happened, primarily because of what I have already said. The emotional response that she has towards each perpetrator is very specific; very, very specific. And that toward him is specific also. As I said before, it was a fearful response. She was scared to divulge what had happened to her.
R. 81
NOTES
[1] The name "Sonya T." is fictitious  for obvious reasons.
[2] At trial the parties stipulated that Dr. Chidester was a licensed and practicing physician. This but begs the question at issue. The mere fact that one is a licensed and practicing physician hardly suggests expertise in child sexual abuse. cf. Hall v. Hilbun, 466 So.2d 856, 875 (Miss. 1985); see also Myers, et al., Expert Testimony in Child Sexual Abuse Litigation, 68 Neb. L.Rev. 1, 11, 12, 24, 83 (1989). Much has been written in recent years regarding expert testimony in child sexual abuse litigation. By far the most comprehensive, current and thoughtful item among the legal literature is this interdisciplinary effort recently published in the Nebraska Law Review. The authors include:

(1) John E.B. Myers, J.D., Professor of Law, University of the Pacific, McGeorge School of Law, Sacremento, California;
(2) Jan Bays, M.D., F.A.A.P., Medical Director of Child Abuse Programs at Emanuel Hospital and Health Center, Portland, Oregon;
(3) Judith Becker, Ph.D., Professor of Clinical Psychology, College of Physicians and Surgeons, Columbia University, and the Director of the Sexual Behavior Clinic, New York Psychiatric Institute, New York, New York;
(4) Lucy Berliner, M.S.W., Assistant Clinical Professor of Social Work, College of Social Work, University of Washington, and Research Director, Harborview Sexual Assault Center, Seattle, Washington;
(5) David L. Corwin, M.D., child psychologist in private practice, and psychiatric consultant to the Multidisciplinary Child Abuse Team at Children's Hospital, Oakland, California; and
(6) Karen J. Saywitz, Ph.D., Assistant Professor of Psychiatry, UCLA School of Medicine, and the Director of Child and Adolescent Psychology Services in the Division of Child and Adolescent Psychiatry, Harbor/UCLA Medical Center, Los Angeles, California.
Their article is cited below as "Myers, et al., supra, 68 Neb.L.Rev. at ___."
[3] In their entirety, these rules read:

RULE 702. TESTIMONY BY EXPERTS
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
RULE 703. BASES OF OPINION TESTIMONY BY EXPERTS
The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
[4] We are not saying that Dr. Chidester may not be shown an expert in the field of child sexual abuse, only that the present record does not show her qualified to give the opinion at issue. A checklist that may be of use to counsel in qualifying such experts has been provided by Myers, et al., supra, 68 Neb.L.Rev. at 10-12.
[5] Myers, et al., supra, 68 Neb.L.Rev. at 66-69; McCord, Expert Psychological Testimony About Child Complaints in Sexual Abuse Prosecutions, 77 Journal of Criminal Law and Criminology 1, 18-41 (1986); Cohen, The Unreliability of Expert Testimony on the Typical Characteristics of Sexual Abuse Victims, 74 Georgetown L.J. 429, 440-44 (1985).
[6] We are not unaware of the professional literature regarding the problems of expert testimony based on novel scientific principles. See, e.g., Neufeld and Colman, When Science Takes the Witness Stand, 262 Scientific American 46 (1990); Myers, et al., supra, 68 Neb.L.Rev. at 19-32; McCord, Syndhromes, Profiles and Other Mental Exotica: A New Approach to the Admissibility of Nontraditional Psychological Evidence in Criminal Cases, 66 Or.L.Rev. 19 (1987). This literature is perceptively surveyed and discussed in State v. Rimmasch, 775 P.2d 388, 394-99 (Utah 1989). What should be emphasized about this view is that it renders dynamic the realm of expert opinion testimony. Should subsequent empirical research and scientific investigation yield a child sexual abuse profile or syndrome, our rules as now written would readily admit opinions from otherwise qualified experts. See State v. Ramsey, 782 P.2d 480, 485 (Utah 1989).
[7] See footnote 4, supra.
[8] Myers, et al., supra, 68 Neb.L.Rev. at 85; see also, Myers, Allegations of Child Sexual Abuse in Custody and Visitation Litigation: Recommendations For Improved Fact Finding and Child Protection, 28 J.Fam.L. 1, 17 (1990).
[9] See Myers, et al., supra, 68 Neb.L.Rev. at 75.
[10] Goodson gave notice twenty days before trial of his intent to offer evidence of the "sexual conduct of the complaining witness." See Rule 412(c), Miss.R.Ev.
[11] Garner's testimony partakes the form of what many in former days may have regarded as an admission. Use of admissions as evidence is now governed by Rule 801(d)(2)(A), Miss.R.Ev., wherein the question becomes whether she is a "party opponent." In a practical sense a prosecuting witness certainly occupies party opponent status. A careful reading of the rule (which, of course, applies in both civil and criminal cases) leaves us convinced that the prosecuting arm of the state, and not the crime victim/prosecutrix, is the defendant's party opponent within Rule 801(d)(2). We do not consider whether such evidence may be admissible under Rule 803(24), Miss.R.Ev., the catchall exception to the hearsay rule, for the point was neither litigated below nor has it been briefed or argued here. See Leatherwood v. State, 548 So.2d 389, 400-02 (Miss. 1989); Mitchell v. State, 539 So.2d 1366, 1370-71 (Miss. 1989); Hall v. State, 539 So.2d 1338, 1342-43 (Miss. 1989); Cummins v. State, 515 So.2d 869, 873-75 (Miss. 1987).
[12] See Kirkland v. State, 371 So.2d 402, 404 (Miss. 1979). Much mythology surrounds this subject. In the past horseback riding and gym classes were often blamed. Today tampon use is the common culprit. For a medical view, see Emans, Woods, Flagg & Freeman, Genital Findings in Sexually Abused, Symptomatic and Asymptomatic, Girls, 79 Pediatrics 778 (May 1987). ["A total of 305 girls between the ages of 1 and 14 years seen at The Children's Hospital or in a pediatric office had a genital examination between November 1984 and January 1986. Of the 305 girls evaluated, 119 were seen because of a history of sexual abuse (group 1), 127 had genital examinations as part of their routine health examination (group 2), and 59 girls were seen for evaluation of genital complaints such a vaginitis, vulvitis, bleeding dysuria (group 3)"]. Id. "The occurrence of abrasions, hymenal tears, intra-vaginal synechiae, and condyloma accuminata have medical and legal significance, even if not statistical significance, because they were found exclusively among abused children in this study. The four girls with hymenal tears all gave a history of pain associated with vaginal penetration." Id. at 784 The absence of a hymenal ring is considered a "suggestive finding" of sexual activity by the medical profession. Id. "In the study of Orr and Prietto, 55% of girls 1 to 15 years of age had "suggestive" findings, including vaginal discharge, erythema, lacerations, or "no hymen". Id. It is likewise not considered conclusive, "the majority of sexually molested children younger than 10 years of age still have normal findings on genital examinations, which should not be used to exclude the possibility of sexual molestation." Id. See also Myers, et al., supra, 68 Neb.L.Rev. at 39-42.
[13] Rule 412 in its entirety reads:

(a) Notwithstanding any other provision of law, in a criminal case in which a person is accused of a sexual offense against another person, reputation or opinion evidence of the past sexual behavior of an alleged victim of such sexual offense is not admissible.
(b) Notwithstanding any other provision of law, in a criminal case in which a person is accused of a sexual offense against another person, evidence of a victim's past sexual behavior other than reputation or opinion evidence is also not admissible, unless such evidence other than reputation or opinion evidence is:
(1) Admitted in accordance with subdivisions (c)(1) and (c)(2) hereof and is constitutionally required to be admitted; or
(2) Admitted in accordance with subdivision (c) hereof and is evidence of
(A) Past sexual behavior with persons other than the accused, offered by the accused upon the issue of whether the accused was or was not, with respect to the alleged victim, the source of semen, pregnancy, disease, or injury; or
(B) Past sexual behavior with the accused and is offered by the accused upon the issue of whether the alleged victim consented to the sexual behavior with respect to which a sexual offense is alleged; or
(C) False allegations of past sexual offenses made by the alleged victim at any time prior to the trial.
(c)(1) If the person accused of committing a sexual offense intends to offer under subdivision (b) evidence of specific instances of the alleged victim's past sexual behavior or evidence of past false allegations made by the alleged victim, the accused shall make a written motion to offer such evidence not later than fifteen days before the date on which the trial in which such evidence is to be offered is scheduled to begin, except that the court may allow the motion to be made at a later date, including during trial, if the court determines either that the evidence is newly discovered and could not have been obtained earlier through the exercise of due diligence or that the issue to which such evidence relates has newly arisen in the case. Any motion made under this paragraph shall be served on all other parties and on the alleged victim.
(2) The motion described in paragraph (1) shall be accompanied by a written offer of proof. If the court determines that the offer of proof contains evidence described in subdivision (b), the court shall order a hearing in chambers to determine if such evidence is admissible. At such hearing the parties may call witnesses including the alleged victim, and offer relevant evidence. Notwithstanding subdivision (b) of Rule 104, if the relevancy of the evidence which the accused seeks to offer in the trial depends upon the fulfillment of a condition of fact, the court, at the hearing in chambers or at a subsequent hearing in chambers scheduled for such purpose, shall accept evidence on the issue of whether such condition of fact is fulfilled and shall determine such issue.
(3) If the court determines on the basis of the hearing described in paragraph (2) that the evidence which the accused seeks to offer is relevant and that the probative value of such evidence outweighs the danger of unfair prejudice, such evidence shall be admissible in the trial to the extent an order made by the court specifies evidence which may be offered and areas with respect to which the alleged victim may be examined or cross-examined. (d) For purposes of this rule, the term "past sexual behavior" means sexual behavior other than the sexual behavior with respect to which the sexual offense is alleged.
[14] Subsequent to the trial of this case, this point was explicitly added to the Rule by the addition of subparagraph (d), which reads, "For purposes of this rule, the term `past sexual behavior' means sexual behavior other than the sexual behavior with respect to which the offense is alleged." See Rule 412(d), effective March 1, 1989.
[15] This Court relied on Mikula in Williams v. State, 427 So.2d 100, 102-03 (Miss. 1983) (adoption of tender years hearsay rule prior to enacting rules of evidence). The part Mikula noted above is not affected by the Rules of Evidence's evisceration of the tender years exception. See Hosford v. State, supra, Mitchell v. State, 539 So.2d 1366, 1369-70 (Miss. 1989) and Leatherwood v. State, 548 So.2d 389, 399 (Miss. 1989).
[16] To evaluate the effect of the evidence that Sonya had no hymenal ring when Dr. Chidester examined her, we sought to review the prosecution's final argument to the jury. The problem is that the record contains no transcript of such argument. It is the appellant's burden to furnish the record. Williams v. State, 522 So.2d 201, 209 (Miss. 1988).

In both his notice of appeal and designation of record, Goodson states "No part of the court record is to be omitted." Fourteen portions of the trial proceedings are specifically designated and closing arguments are not among them. We are left with the disquiet that all at this trial functioned according to a practice we have repeatedly sought to inter: the court reporter simply does not take down argument of counsel. Whether it is designated as a part of the record on appeal turns on the wishes of counsel. Rule 10(b), Miss.Sup.Ct. Rules. The court reporter should preserve every word spoken so that it will be available if designated. Cf. Winters v. State, 473 So.2d 452, 457-58 (Miss. 1985); Dorrough v. State, 437 So.2d 35, 37 (Miss. 1983).
[1] From this history Sonya gave Dr. Chidester, and describing to the doctor how it felt when her uncle penetrated her anally, Dr. Chidester could very easily have testified this behavior "indicated she had been raped by her uncle, as she told me." Or, the doctor could have said the behavior "indicated she was a victim of child sexual abuse by her uncle." She said neither. She did not even opine that Sonya was a victim of "child sexual abuse."
[2] The majority has left the world of reason.

I shall never forget Dr. McLaurin, a dentist I met as a seven-year-old child. All by myself I went cheerfully on my first trip to his office just off the lobby of the old Concord Hotel in Natchez. The second trip into his office I went dragged, screaming and yelling, by my mother. What kind of expert would it have taken, observing my mother and me, that here was a child who had been "traumatized by a dental experience."
[3] Rule 702 states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
[4] It may very well now appear in some of the treatises on humor.

Frye test, where were you when this Court wrote Miller, Hooten, supra? Frye v. United States, 293 F. 1013 (D.C. Cir.1923).
[5] Nor should we overlook Miss. Farm Bureau Mut. Ins. Co. v. Garrett, 487 So.2d 1320 (Miss. 1986), cited by the majority. (Majority Opinion, p. 1146) A chiropractor was held qualified to give an opinion as to a medical diagnosis, prognosis, and opine as to "future disability, future pain and suffering and mental and emotional anguish." [Emphasis added] Id. at 1325. We held that so long as the opinion lay "within the field of chiropractory" and the witness was a licensed and practicing chiropractor, he could give such opinions. From their advertisements I was unaware that there is any disease outside "the field of chiropractory."
[6] Indeed it is. The Cumulated Index Medicus (1989) under the heading "Child Abuse, Sexual," lists several hundred treatises and articles on this subject under the following sub-headings:
 Complications
 Diagnosis
 Epidemiology
 Legislation and Jurisprudence
 Prevention and Control
 Psychology
 Rehabilitation
 Statistics & Numerical Data
 Therapy

Kemp, C.H., "Sexual Abuse, Another Hidden Pediatric Problem," 62 Pediatrics 382 ff. (1978), defines the term as:
[T]he involvement of dependent, developmentally immature children and adolescents in sexual activities they do not fully comprehend, to which they are unable to give informed consent, or that violates social taboos of family roles.
Blumberg, M.L., "Sexual Abuse of Children: Causes, Diagnosis and Management," 13 Pediatrics Annals, 735 ff. (1984), defines the term as:
"[T]he exposure of a child to sexual stimulation inappropriate for his or her age, the level of psychological development, and the child's role in the family."
Dr. Chidester's opinion may, but certainly did not necessarily fit into this category.
[7] The pertinent portions of Rule 412 are as follows:

RULE 412. SEX OFFENSE CASES; RELEVANCE OF VICTIM'S PAST BEHAVIOR
(b) Notwithstanding any other provision of law, in a criminal case in which a person is accused of a sexual offense against another person, evidence of a victim's past sexual behavior other than reputation or opinion evidence is also not admissible, unless such evidence other than reputation or opinion evidence is:
* * * * * *
(A) Past sexual behavior with persons other than the accused, offered by the accused upon the issue of whether the accused was or was not, with respect to the alleged victim, the source of ... injury; . ..
* * * * * *
(3) If the court determines on the basis of the hearing described in paragraph (2) that the evidence which the accused seeks to offers is relevant and that the probative value of such evidence outweighs the danger of unfair prejudice, such evidence shall be admissible in the trial to the extent an order made by the court specifies evidence which may be offered and areas with respect to which the alleged victim may be examined or cross-examined. [Emphasis added]
[8] The MRE are virtual carbon copies of the Federal Rules of Evidence, enacted by Congress in 1975. Under Rule 103, no evidentiary ruling by a trial judge will be disturbed on appeal in the absence of an abuse of discretion. Pierce Packing Co. v. John Morrell Co., 633 F.2d 1362 (9th Cir.1980); U.S. v. Medel, 592 F.2d 1305 (5th Cir.1979), reh. den., 597 F.2d 772 (5th Cir.1979). And, a case will not be reversed because of an error in an evidentiary ruling in the absence of a "substantial right" of a party being affected. Muzyka v. Remington Arms Co., Inc., 774 F.2d 1309 (5th Cir.1985); U.S. v. Saenz, 747 F.2d 930 (5th Cir.1984), reh. den. 752 F.2d 646, cert. den. 473 U.S. 906, 105 S.Ct. 3531, 87 L.Ed.2d 655 (1985).

Most significantly, it was manifestly discretionary with the circuit judge under the "rape shield statutes" enacted in many states (see Miss. Code Ann. §§ 97-3-68, -70), which Congress codified under Rule 412, and set forth at length in the majority opinion.
[9] I cannot ignore the glaring difference between this Court's treatment of our Legislative branch of government on statutes dealing with evidence, and the deference shown Congressional enactments on evidence by the Federal Courts. As shown in Shaw, supra, the court sought to ascertain Congressional intent in enactment of Rule 412 by Congress, a rule which this Court has adopted verbatim. In Hall v. State, supra, this Court held that it was beyond legislative "competence" to enact an evidentiary statute of any kind. See also, Mitchell v. State, 539 So.2d 1366 (Miss. 1989), Hawkins dissenting; and Leatherwood, supra, Hawkins dissenting.

How is it that the people of Mississippi cannot authorize their Legislature to pass evidentiary laws, and only the judiciary has the competence to enact them?