# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2009-KA-00420-SCT

*JAMES DAVID POOLE a/k/a JIM*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/27/2009 |
| TRIAL JUDGE: | HON. PAUL S. FUNDERBURK |
| COURT FROM WHICH APPEALED: | MONROE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | GARY GOODWIN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LAURA H. TEDDER |
| DISTRICT ATTORNEY: | JOHN RICHARD YOUNG |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 08/12/2010 |
| MOTION FOR REHEARING FILED: | 09/09/2010; DENIED AND MODIFIED AT ¶ 24 - 11/10/2010 |
| MANDATE ISSUED: | |

**BEFORE GRAVES, P.J., DICKINSON AND CHANDLER, JJ.**

**DICKINSON, JUSTICE, FOR THE COURT:**

¶1. After James Poole's ex-girlfriend accused him of raping her daughter, he was indicted, tried, and found guilty on one count of statutory rape, but not guilty on a second. Poole appeals, claiming the conviction was against the overwhelming weight and sufficiency of the evidence. We disagree and affirm.

## BACKGROUND

¶2. In May, 1999, Janet Bridges — who was a single mother living in Amory, Mississippi, with her eight-year-old daughter, Jane[1] — met James Poole. In August, 1999,

---

[1] We use a fictitious name for the child to protect her identity.

according to the State's allegations, Poole moved in with Janet and, for the next thirty-seven months, repeatedly raped Jane.

¶3.     One night, several months after Poole moved in, Jane had a nightmare and got in bed with Janet and Poole. She later described what happened:[2] "I don't know what it was, but I would feel something in between my legs. That was the first time. And there were a few more times, too." Describing the next time, Jane said, "He had come in one night, and I was already asleep, and I remember a bunch of wrestling around." She "woke up, and he was about to leave the room, and there was something on my leg. And, you know, I said — he said, you know, go back to bed. It was a dream . . . ." She wiped "something white" off her leg. Looking back, she believed that it was semen.

¶4.     During 2000, Jane testified, Poole's abuse worsened. He began inserting his fingers in her vagina, then, his penis. "At first he would just put the tip in," Jane recalled. "Eventually, he would put it in all the way." She remembered "a lot of bleeding" and pain. She asked Poole to stop, but he would not.

¶5.     Jane testified that, at first, she believed Poole when he told her his conduct was just the normal "playing" fathers[3] did with their daughters. But when Poole began hurting her and refusing to stop, she started to realize that something was amiss because "a father

---

[2] The quotations in this Background section come from trial testimony.

[3] Jane's father, to whom Janet had been married and who was plagued by severe substance abuse, had been absent most of Jane's life. From the time Jane was three years old, his addictions and resulting illnesses had kept him away from his family and in a series of institutions. The couple divorced when Jane was five, and he died some time after that.

wouldn't hurt somebody." Again she asked him to stop, but he would not. Instead, he threatened to kill her and her mother if she told anyone.

¶6.   Janet's job kept her away from home many evenings and on Saturdays, as did her mother's terminal illness in 2002. Jane and Poole were often in the house alone, and during these times he would "do these things" to her. Later, Poole's son, Jamie, moved in with them. Poole "would lock Jamie in his room and tell him that if he got off his bed, a monster would come and get him or something." Then, Poole would "do it."

¶7.   When Janet was at home, she often took prescription drugs. She said that after her mother died, she did not sleep well, and she "went to the doctor and was put on prescription to help me deal with things. And so every night . . . I took my medicine, and I went to bed." Afterwards, Poole would molest Jane.

¶8.   Jane began to undergo emotional and behavioral changes. Janet testified that Jane became "kind of withdrawn, in herself a little bit. There was [*sic*] more discipline problems. . . . Jane all of a sudden started not being able to go to sleep. I didn't understand why, because when she was younger you could put her to bed and she'd go to sleep."

¶9.   Poole, too, changed — he began acting distant and aloof, and started sleeping on the sofa. He went away for Labor Day weekend 2002, and "when he came back," Janet said, "he was a different person. He said he was leaving." Two weeks later, he moved in with another woman.

3

¶10. After Poole left, Janet continued to have some contact with him. Several times, she called him to ask for help with Jane's behavioral problems. At least once, he came to her home. Occasionally, Janet dropped Jane off at Poole's home for play dates with Jamie.

¶11. After Poole moved out, Jane's behavioral and emotional problems intensified. She became violent toward both herself and others. Once she tried to attack Janet with a knife. During another fit of rage, she broke a window with her hand, severely cutting herself. At trial, Janet described several other violent incidents which resulted in a two-week stay at a psychiatric hospital, repeated doctor visits, prescriptions for various medications, a diagnosis of post-traumatic stress disorder, and, finally, a stint at a church-affiliated boarding school in Alabama.

¶12. In the fall of 2004, Janet got a phone call from Jane at the school. Janet said that Jane "mentioned on the phone that she needed to tell me something." But Jane would not say what was on her mind. Janet testified, "She was mumbling, and she just said something about Jim. I said, What are you talking about? Did he contact you over there or something? No, Mama, I'll talk to you later." During their next visit, when asked about the phone call, Jane replied, "Never mind, Mama. It's okay."

¶13. Under cross-examination, Janet stated that the phone call had actually been in the spring of 2004, not the fall. Again she stated that her daughter had alluded to something worrisome, but would not elaborate. Poole's attorney asked, "And you're saying that in this conversation she didn't accuse my client of doing anything sexual to her. She just said to you, something happened." Janet replied, "Yes." Jane, testifying about this phone call, said,

4

"I didn't want to tell my mother everything over the phone, but I just told her that, you know, some stuff had happened."

¶14.  Janet testified that approximately a month after Jane returned from Alabama, she took Jane to Wal-Mart.  As they drove through the parking lot, Jane suddenly became agitated and "just threw herself down on the floorboard and started crying.  She — the only thing I could get out of her is, it's him, it's him.  I said, What are you talking about, Jane?  Mama, take me home.  She was hysterical."

¶15.  Testifying about this event, Jane said after she returned from Alabama in July,[4] she saw Poole "once more.  We were in a parking lot somewhere, and I saw him or his car, and I remember just going to the floorboard and crying because I didn't want him to see me."  Asked when that was, she answered, "It was after I had been to the children's home, so '05."  She further testified, "I don't remember if it was him or his truck, but I saw one or the other and just hit the floorboard.  And my mom took me home because she didn't know what was going on.  She kept talking to me, and that's when I told her everything."

¶16.  Janet testified that she went to the police "that next Monday morning, [and] filed a report."  Although no police report appears in the record, Poole's attorney produced at trial a "statement" that she said "was included in the discovery I received from the State . . . ."  The statement included the following:  "In June 2004, Jane told me over the phone she had something to tell me about Jim.  She would say that he slowly over a period of months went

_____

[4] Although Jane was unsure whether it was in July of 2004 or 2005, she had no doubt that it was in July.  Later, under cross-examination, she agreed that it was July 2004.

from masturbating on her leg to fondling, and then on to the other." With respect to the considerable testimony about the content of Janet's phone call with Jane, and the statement Janet gave to the police, the record includes no objection.

¶17. Poole was indicted and charged with two counts of statutory rape. At his trial, Janet and Jane provided lengthy testimony. Dr. James Chaney, an OB/GYN, testified that he examined Jane on January 7, 2005. In his notes regarding the exam, Dr. Chaney stated: "She did relate in her history that she had been the victim of some sexual abuse, inappropriate fondling by a former boyfriend of her mother's. . . . She is not sexually active. . . . The hymen is intact but the introitus easily admits a pediatric speculum." A Pap smear revealed "findings of human papillomavirus," a sexually transmitted disease.

¶18. The jury found Poole guilty on one count of statutory rape, but not guilty on the other.

**ANALYSIS**

¶19. On appeal, Poole's only assignments of error are that his conviction was against the sufficiency and the weight of the evidence.

**Sufficiency of the Evidence**

*Standard of review*

¶20. The **Bush v. State**[5] test for sufficiency of the evidence is familiar. We "view[] the evidence in the light most favorable to the prosecution" to determine whether "rational," "reasonable fair-minded" jurors "*could have found*" that the State proved each "essential

---

[5] **Bush v. State**, 895 So. 2d 836, 843 (Miss. 2005).

6

element" of the crime.[6]  We are not required to decide — and in fact we must refrain from deciding — whether we think the State proved the elements.  Rather, we must decide whether a reasonable juror could rationally say that the State did.  If, on any element of the crime, it is impossible to say that a reasonable person could have found that the State proved that element, then we must reverse and render.  Otherwise, we must affirm as to that assignment of error.

*The Elements of Statutory Rape*

¶21.    The elements of statutory rape of a child under fourteen years of age are fixed by statute:

1. A person of any age
2. has sexual intercourse
3. with a child who is under the age of fourteen
4. who is twenty-four or more months younger than the person and
5. who is not the person's spouse.[7]

¶22.    Poole neither argued at trial nor raised on appeal any claim of error as to elements 1, 3, 4, and 5, so we need not address them.  He does claim that the evidence as to whether he had sexual intercourse with Jane was insufficient.

¶23.    The statutory definition of sexual intercourse at the time (the statutory definition has since changed) limited it to "a joining of the sexual organs of a male and female human being in which the penis of the male is inserted into the vagina of the female."[8]  So we must

---

[6] *Id.* at 843 (emphasis added).

[7] Miss. Code Ann. § 97-3-65 (Rev. 2006).

[8] Miss. Code Ann. § 97-3-65(5) (Rev. 1998).

7

determine whether the record contains sufficient evidence to support a hypothetical reasonable juror's decision that Poole penetrated Jane's vagina with his penis.

*The Evidence of Penetration*

¶24.    Jane testified on direct examination:

> Q: And what would he do with his penis?
> A. At first he would just put the tip in.
> Q. He would put the tip in your vagina?
> A. Yeah.
> Q. Did he ever do more than that?
> A. Yes.  Eventually, he would put it in all the way.

*Jane's testimony may be enough.*

¶25.    We have held that "[a]n individual may be found guilty of rape on the uncorroborated testimony of the prosecuting witness, where the testimony is not discredited or contradicted by other credible evidence."[9] So Jane's testimony, alone, was sufficient, provided it was "not discredited or contradicted by other credible evidence."[10] Poole argues that it was discredited or contradicted.

¶26.    Poole argues Jane's testimony is not credible because

---

[9] ***Parramore v. State***, 5 So. 3d 1074, 1077-78 (Miss. 2009) (*citing* ***Withers v. State***, 907 So. 2d 342, 353 (Miss. 2005) (persons accused of statutory rape "may be found guilty on the uncorroborated testimony of a single witness"); ***Killingsworth v. State***, 374 So. 2d 221, 223 (Miss. 1979) ("While it is true that a conviction for rape may rest on the uncorroborated testimony of the person raped, that testimony should always be scrutinized with caution."); ***Dubose v. State***, 320 So. 2d 773, 774 (Miss. 1975) ("[T]he testimony of the victim of a rape may be sufficient to support a guilty verdict where the victim's testimony is neither contradicted nor discredited by other evidence or by surrounding circumstances."); ***Blade v. State***, 240 Miss. 183, 188, 126 So. 2d 278, 280 (1961) ([T]he testimony of the prosecutrix in a rape case "does not need corroboration . . . .")).

[10] ***Id.***

in describing a forcible rape from the standpoint of his insertion of his penis, there also is no doubt the jury considered Dr. Chaney's testimony that his findings as to the condition of Jane's hymen would be inconsistent with full penile penetration. Dr. Chaney's testimony left no doubt that no full penetration had ever occurred, unless the penetration had been with a penis the size of Dr. Chaney's finger. Unfortunately, there was no elaboration as to the size of Dr. Chaney's finger. No doubt, however, the jury was able to view Dr. Chaney on the stand. Jane's testimony was, therefore, suspect and incredible, substantially contradicted by medical testimony.

¶27. Stated differently, Poole argues that the uncontradicted evidence of Jane's intact hymen contradicts her testimony. But when asked at trial whether the intact hymen ruled out penetration, Dr. Chaney replied:

> The — I would think that the evidence of the intact hymen would suggest that penetration had not taken place, but there's certainly a spectrum of just the diameter, the size of the vaginal opening, and I think — I couldn't say completely that that would preclude the possibility of penetration, at least partially, maybe having taken place.
> . . .
>
> That's a tough one. I think that, I think that there certainly could be partial, you know, partial insertion, but it's a, it's a physical sort of thing. Just with the diameter of the hymen, the size of the penis, you know, there's certainly a lot of variation from individual to individual as far as that, you know, as far as that goes. And so, you know, I certainly think, yeah, I think that's certainly possible.

¶28. This Court has never adopted the rule — as many other jurisdictions have — that evidence of an intact hymen is not conclusive proof that there was no penetration. The closest we have come was in 1990, when we discussed, albeit in dicta in a footnote, a medical-journal article entitled *Genital Findings in Sexually Abused, Symptomatic and*

9

*Asymptomatic, Girls.*[11]  Among the article's findings: "the majority of sexually molested children younger than 10 years of age still have normal findings on genital examinations [including, in girls, intact hymens], which should not be used to exclude the possibility of sexual molestation."[12]

¶29.    The terms "sexual molestation" and "rape" are not synonyms. So we cannot conclude, based solely on *Goodson,* that because evidence of an intact hymen does not rule out sexual molestation, it also does not rule out rape.

¶30.    We are unable to find a Mississippi case in which the defendant was charged with rape and the victim's hymen was reported to be intact. Cases from other states, however, are helpful.

¶31.    In a North Carolina case,[13] the defendant was convicted of "feloniously obtaining carnal knowledge of a virtuous girl between the ages of twelve and sixteen years."[14]  The court explained that

> the terms "carnal knowledge" and "sexual intercourse" are synonymous. There is "carnal knowledge" or "sexual intercourse" in a legal sense if there is the slightest penetration of the sexual organ of the female by the sexual

---

[11] *Goodson v. State*, 566 So. 2d 1142, 1148 n.12 (Miss. 1990).

[12] *Id.* (*quoting* S. Jean Emans et al., *Genital Findings in Sexually Abused, Symptomatic and Asymptomatic, Girls*, 79 Pediatrics 778 (May 1987)).

[13] *State v. Bowman*, 232 N.C. 374, 61 S.E.2d 107 (1950).

[14] *Id.* at 107.

organ of the male.  It is not necessary that the vagina be entered or that the hymen be ruptured; the entering of the vulva or labia is sufficient.[15]

So under North Carolina law, a girl with an unruptured hymen may — depending on the other evidence — be deemed to have had sexual intercourse.

¶32.    Relying on the above quote from **Bowman**, the Tennessee Supreme Court adopted this rule in 1954, writing: "This statement from the North Carolina Supreme Court is clearly in line with the overwhelming weight of modern authority.  We think that unquestionably it is sound and adopt it as the rule applicable in Tennessee."[16]

¶33.    Addressing Georgia law, the United States Court of Appeals for the Fifth Circuit has stated:

> Under the established rule in this State, the penetration of the female sexual organ by the sexual organ of the male, which is necessary to constitute rape, need be only slight.  It is not necessary that the vagina shall be entered or the hymen ruptured, but an entering of the anterior of the organ, known as the vulva or labia, is sufficient."[17]

¶34.    And in a 1974 rape case, the Alabama Court of Criminal Appeals stated that "penetration to any particular extent is not required . . . nor need there be an entering of the vagina or rupturing of the hymen, the entering of the vulva or labia being sufficient; but some degree of entrance of the male organ within the labia pudendum is essential."[18]

---

[15] **Id.** at 108.

[16] **Walker v. State**, 273 S.W.2d 707, 711 (Tenn. 1954).

[17] **Roberts v. Dutton**, 368 F.2d 465, 471 (5th Cir. 1966).

[18] **Thomas v. State**, 298 So. 2d 652, 656 (Ala. Crim. App. 1974) (*quoting* 75 C.J.S. *Rape* § 10b).

11

¶35.    The Kansas Supreme Court has held:  "Penetration is an element of rape, but any penetration, however slight, is sufficient.  To establish this element, actual penetration of the vagina or rupturing of the hymen is not required; penetration of the vulva or labia is sufficient."[19]  In that case, a doctor testified that, although the victim's hymen was intact, "because of its elasticity, some women can have intercourse with no trauma to the hymen."[20]

¶36.    These decisions from our sister states are compelling.  We join them in holding that evidence of an intact hymen is not conclusive proof that no penetration occurred.

*Scrutiny of Jane's Testimony*

¶37.    In ***Killingsworth v. State***, we warned that "[w]hile it is true that a conviction for rape may rest on the uncorroborated testimony of the person raped, that testimony should always be scrutinized with caution."[21]  We have done so, and we find no troubling aspects of Jane's testimony.  So under our holding in ***Parramore***, the evidence given by Jane's testimony was sufficient to establish the element of sexual intercourse, even when subjected to the scrutiny required by ***Killingsworth***.  We find no reversible error.

*Weight of the Evidence*

¶38.    As with testing the sufficiency of the evidence, ***Bush v. State*** guides us in evaluating its weight:

---

[19] ***State v. Borthwick***, 880 P.2d 1261, 1271 (Kan. 1994) (*citing **State v. Ragland***, 173 Kan. 265, 268, 246 P.2d 276 (1952)).

[20] ***Id.***

[21] ***Killingsworth v. State***, 374 So. 2d 221, 223 (Miss. 1979).

12

[W]e will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice. . . . [T]he court sits as a thirteenth juror. The motion [for a new trial], however, is addressed to the discretion of the court, which should be exercised with caution, and the power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict. However, the evidence should be weighed in the light most favorable to the verdict.[22]

Poole argues as follows:

As the thirteenth juror in this case, this Court must scrutinize with caution, [*sic*] Jane's testimony. There is [*sic*] sufficient evidence and circumstances to discredit her testimony, and it is undoubtedly enough evidence to say there is "much in the facts and circumstances to discredit her testimony". [*sic*] Since the jury split on the two verdicts, it no doubt discredited her testimony in part, if not in whole, and the testimony of Dr. Chaney was certainly sufficient for no reasonable juror to have not discredited her testimony in full. Accordingly, the Circuit Judge should have granted Jim a new trial.

¶39.   As we understand Poole's argument, he thinks because "the jury split on the two verdicts," it discounted Jane's testimony. His single brief (he filed no reply brief) cites no authority to support this claim. Nor does it identify what "facts and circumstances" might "discredit her testimony." Poole has failed to persuade us that the "verdict . . . is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice,"[23] and this is not one of those "exceptional cases in which the evidence preponderates heavily against the verdict."[24]

---

[22] ***Bush v. State***, 895 So. 2d 836, 844 (Miss. 2005) (*quoting **Amiker v. Drugs For Less, Inc.***, 796 So. 2d 942, 947 (Miss. 2000); *citing **Herring v. State***, 691 So. 2d 948, 957 (Miss. 1997)).

[23] ***Id.*** at 844.

[24] ***Id.***

**CONCLUSION**

¶40.    Sufficient evidence existed for the jury to have found Poole guilty.  The verdict was not against the weight of the evidence.  Therefore, we affirm the judgment of the circuit court.

¶41.    **CONVICTION OF STATUTORY RAPE AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH TEN (10) YEARS SUSPENDED, AND FIVE (5) YEARS OF POST-RELEASE SUPERVISION, WITH CONDITIONS, AFFIRMED.**

**WALLER, C.J., CARLSON, P.J., RANDOLPH, LAMAR, KITCHENS, CHANDLER AND PIERCE, JJ., CONCUR.  GRAVES, P.J., CONCURS IN RESULT ONLY.**